**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **IDA RENAE NOBLES,** | § | |
| **INDIVIDUALLY, K.N., MINOR, BY** | § | |
| **AND THROUGH HIS GUARDIAN** | § | |
| **KADEIDRA BELL, & L.N., MINOR, BY** | § | |
| **AND THROUGH HIS GUARDIAN** | § | |
| **MICHELLE DASHAUN SMITH AS** | § | |
| **HEIRS AT LAW TO THE ESTATE OF** | § | |
| **LANDON NOBLES,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:19-cv-00389-ML** |
| | § | |
| **SERGEANT RICHARD EGAL,** | § | |
| **CORPORAL MAXWELL JOHNSON,** | § | |
| **Defendants.** | § | |
| | § | |

**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
AND, IN THE ALTERNATIVE, FOR NEW TRIAL OR REMITTITUR**

TO THE HONORABLE MARK LANE, UNITED STATES MAGISTRATE JUDGE:

**INTRODUCTION**

On December 15, 2021, the jury rendered a verdict finding that Defendants Richard Egal and Maxwell Johnson were liable to Plaintiffs for the use of excessive force on Landon Nobles. (Doc. No. 70) The verdict finding against Egal and Johnson should be overturned because it is not supported by any evidence and was against the great weight of the evidence. Barring that outcome, this court should award a new trial due to a number of errors during the trial including improper appeals to the jury by Plaintiffs' counsel during opening statement and closing argument which affected the verdict on liability and the clearly excessive amount of the verdict. Alternatively, the Court should enter a remittitur which significantly reduces the verdict.

STANDARD OF REVIEW

## I.      Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(b), if the court denies a judgment as a matter of law made under Rule 50(a), then the movant may file a renewed motion after the jury renders its verdict.  The court should grant a motion under Rule 50(b) if the evidence points only one way and no reasonable inferences could be drawn that may support the opposing party's position. *See Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 455 (5th Cir. 2001).

Ordinarily, a Rule 50(b) motion includes only the grounds for dismissal contained in a Rule 50(a) motion.  A court may consider additional grounds not raised in a Rule 50(a) motion, however, and review those additional grounds using a "plain error" standard.  *U.S. for use of Wallace v. Flintco, Inc.*, 143 F.3d 955, 963 (5th Cir. 1998).  To establish plain error, a litigant must show: "(1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) the plain error must affect substantial rights; and (4) not correcting the error would seriously impact the fairness, integrity, or public reputation of judicial proceedings."  *Septimus v. Univ. of Houston*, 399 F.3d 601, 607 (5th Cir. 2005).

## II.     Motion for New Trial and Remittitur

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course."  *Id.*  The Court is required to view the evidence "in a light most favorable to the jury's verdict, but the verdict should be rejected if the evidence points so strongly

and overwhelmingly in favor of the moving party that the court believes that reasonable persons could not arrive at a contrary conclusion. *Dawson v. Wal–Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

If a reviewing court finds that a verdict was motivated by passion or prejudice, then a new trial is the only appropriate remedy. If, however, a court finds that an excessive damages award resulted from some other factor, it may remit the damages to the maximum amount it believes the jury could have awarded given the evidence. *Guajardo v. GC Services, LP*, 498 Fed. Appx. 379, 386-87 (5th Cir. 2012) (per curiam).

## ARGUMENT & AUTHORITIES

### III. There was Insufficient Evidence to Support the Jury's Finding that Egal and Johnson Violated Landon Nobles' Constitutional Rights by Using Excessive Force; Egal and Johnson are Entitled to Qualified Immunity.

No reasonable jury, not influenced by improper appeals to passion, prejudice and emotion, could have found that Egal and Johnson used excessive force and are not entitled to qualified immunity based on the evidence presented at trial. The overwhelming evidence at trial demonstrated that Egal and Johnson had reason to believe that Nobles posed a threat of serious harm when he turned toward the officers while holding a gun in his right hand and fired a shot. This threat of serious harm was established not only by the testimony of Egal and Johnson but also the testimony of the other officers at the scene and the testimony of Andre Anderson and Elvis Ingram who heard the sound of a small caliber handgun come from Nobles' direction. Moreover, the physical evidence at the scene established that Nobles had a handgun and fired a round. Plaintiffs offered no explanation, and certainly no competent evidence, of how the handgun and holster arrived at Nobles' feet after the shooting.

### A.   Qualified Immunity Standard

"The doctrine of qualified immunity immunizes government officials acting within their discretionary authority from civil damages if their conduct does not violate clearly established constitutional law of which a reasonable person would have known." *Modica v. Taylor*, 456 F.3d 174, 179 (5th Cir. 2006).  Whether an individual is entitled to qualified immunity is determined by following a two-part analysis.  First, the court must determine whether the facts, taken in the light most favorable to the party asserting the injury, show that the official violated a "clearly established" constitutional right.  *Price v. Roark*, 256 F.3d 354, 369 (5th Cir. 2001).  If there is no constitutional violation, the inquiry ends in favor of the official asserting qualified immunity. *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003).  Second, the court must determine whether the official's conduct was objectively reasonable in light of the clearly established law. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  In other words, courts look to whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Price*, 256 F.3d at 369.  Qualified immunity protects officials who merely make a mistake in judgment and it shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).  When a defendant asserts qualified immunity, the burden is on the plaintiff to produce evidence to pierce that immunity.  *Atteberry v. Nocona General Hospital*, 430 F.3d 245, 253 (5th Cir. 2005).

Claims of excessive force are analyzed under the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  To succeed on an excessive force claim under 42 U.S.C. §1983 and overcome qualified immunity, a plaintiff bears the burden of showing "(1) an injury (2) which resulted directly and only from the use of force that was excessive to the need and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 835, 843 (5th Cir.

2009).  "In gauging the objective reasonableness of the force used," the court "must balance the amount of force used against the need for the force."  *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).  It is not unreasonable to use deadly force when an officer has reason to believe that the suspect poses a threat of serious harm to the officer or others.  *Tennessee v. Garner,* 471 U.S. 1, 10, 105 S. Ct. 1694, (1985) Whether a particular use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Ikerd,* 101 F.3d at 434. Courts should also recognize that officers must make split-second decisions in stressful and unpredictable circumstances.  *Id.*

**B.**   **Richard Egal and Maxwell Johnson reasonably believed that Landon Nobles' actions presented an imminent threat of serious injury to themselves and others.**

The question in this case is whether no reasonable officer could have believed that the shooting of Nobles was lawful.  In answering this question, the focus of the inquiry is "the act that led [the officer] to discharge his weapon." *Manis v. Lawson,* 585 F.3d 839, 845 (5th Cir. 2009). The testimony of every witness who was in a position to see Nobles' right hand established that Nobles was holding a handgun just before Egal and Johnson fired their weapons.  The testimony and physical evidence also established that Nobles' gun fired shortly after Nobles collided with Egal's bicycle.

Johnson testified that the act that led Johnson to discharge his weapon was Nobles' act of holding the gun in his right hand and actually firing the gun in the direction of Johnson and other officers.  Officer Uri Tamez testified that as he chased Nobles north on Trinity Street, he saw the gun in Nobles' right hand and saw Nobles turn and fire the gun. The testimony of security guards Andre Anderson and Elvis Ingram also supports the conclusion that Nobles discharged the gun shortly before Egal and Johnson discharged their weapons.  Both Anderson and Ingram testified that after Nobles collided with Egal's bicycle, they heard the distinct sound of a small caliber

handgun come from Nobles' direction.  Anderson and Ingram, who both are familiar with guns and the sounds of guns, testified that the sound they heard was not the sound of a 9 millimeter firearm like those carried by the officers, but instead was the sound of a small caliber firearm. Anderson testified that the officers had not drawn their guns at the time Anderson heard the sound of the small caliber firearm.  Neither Anderson nor Ingram saw Nobles' hands, or whether anything was in his hands, prior to the officers discharging their firearms.

Egal testified that the act that led Egal to discharge his firearm at Nobles was Nobles holding the gun in his right hand and then turning the right side of his body in the direction of Egal and other officers. Officer Steven Pena testified that he also saw the gun in Nobles' right hand and saw Nobles turn in the officers' direction.  Anderson as well testified that he saw Nobles turn in the officers' direction before Egal and Johnson discharged their firearms.  Officers Pena and Tamez were in the process of drawing their firearms toward Nobles when Johnson and Egal, who were closer to Nobles, fired their firearms at Nobles.  All of the officers who were at the scene and saw Nobles' actions testified that they believed that Nobles' actions constituted an imminent threat of serious bodily injury to the officers and others.

Nobles' possession of the gun is also supported by the physical evidence at the scene. The officers testified that when they approached Nobles after he fell to the ground, they immediately saw a handgun near Nobles' feet and Pena secured it.  The gun was identified as a 32 caliber automatic pistol manufactured by Crvena Zastava.  APD crime scene specialists later secured other evidence, including two 32 caliber spent shell casings, one located in front of the Mooseknuckle Pub where a firearm had earlier been discharged, and another near Egal's bicycle on Trinity Street. APD firearms examiner Greg Karim test-fired the 32 caliber pistol found at Nobles' feet and microscopically examined the spent casings found at the scene and the test-fired casings and

concluded that the spent casings found at the scene were fired from the 32 caliber pistol found at Nobles' feet.  The fact that the two spent shell casings matched the 32 caliber handgun is undisputed. Plaintiffs offered no evidence to dispute these conclusions.

Plaintiffs offered no actual evidence to dispute the physical evidence found at the scene that leads to no other conclusion than Nobles fired the handgun shortly after the collision with the bicycle.  Plaintiffs also offered no actual evidence to dispute the video from the HALO camera, Ex. D-5, which demonstrated that Nobles fired the initial shot in the air in front of the Mooseknuckle Pub.  Moreover, Plaintiffs offered no evidence whatsoever that the integrity of APD's investigation of this incident was compromised in any way.  Plaintiffs' counsel's unsupported and improper statements in closing argument, see *infra*, that insinuated that APD personnel conspired to plant the evidence is pure fantasy and not supported by any testimony or other evidence.  This "thin blue line" conspiracy theory does not even rise to the level of speculation and guesswork and is completely insufficient to meet the Plaintiffs' burden of overcoming qualified immunity.

Egal's and Johnson's actions fall within the objective reasonableness standard established by the United States Supreme Court and the Court of Appeals for the Fifth Circuit.  In fact, the risk posed by Nobles in this case was far greater than the risk posed in *Kisela v. Hughes,* 138 S. Ct. 1148 (2018) where the Supreme Court found that a police officer was entitled to qualified immunity when he shot a person holding a knife who was standing at least six feet from the person police believed was threatened.  Obviously, a gun such as the one Nobles had in this incident is deadly from a much greater distance than a knife, and courts have made clear that the law does not require officers to wait until a suspect actually uses a deadly weapon before the officers can act to stop the suspect.  *Garza v. Briones,* 943 F.3d 740, 748 (5th Cir. 2019).

The risk posed by Nobles' actions are also similar, if not greater, than many other cases in which the Fifth Circuit has held that qualified immunity attached to the officers' conduct.  In *Ballard v. Burton,* 444 F.3d 391, 403 (5th Cir. 2006), the Fifth Circuit held that where police shot an emotionally unstable man after he fired a rifle into the air and then aimed it in the general direction of multiple police officers, qualified immunity existed.  In *Hudspeth v. City of Shreveport,* 270 Fed. Appx. 332, 337 (5th Cir. 2008) police shot a suspect who pointed a cellphone which police believed to be a gun at officers and who ignored orders to get on the ground.  The Fifth Circuit affirmed a finding of qualified immunity and also held that the fact the suspect had his back to the officers at the instant deadly force was used was not relevant to whether the officers could reasonably perceive the suspect to be a threat of serious bodily harm.  *Id.*

In *Ramirez v. Knoulton,* 542 F.3d 124 (5th Cir. 2008), the Fifth Circuit held that an officer was entitled to qualified immunity when he shot a suicidal suspect armed with a handgun who failed to comply with officers' orders to drop the gun.  The Fifth Circuit emphasized that the reasonableness of the use of force is to be judged from the perspective of a reasonable officer at the scene, particularly whether the suspect poses an immediate threat to the safety of the officers or others.  *Id.*  at 129.  In *Valderas v. City of Lubbock,* 937 F.3d 384 (5th Cir. 2019), the Fifth Circuit addressed a plaintiff's argument that an officer's use of deadly force was unreasonable since the plaintiff had discarded a firearm, put his hands up and turned to flee at the time the officer discharged his weapon.  The Fifth Circuit affirmed the grant of qualified immunity to the officer, noting that the events took place in a matter of seconds leaving the officer with little time to realize that the plaintiff was no longer armed before making the decision to open fire.  *Valderas,* 937 F.3d at 390.  The Court held that considering the totality of the circumstances, a reasonable officer in

the officer's position would have reasonably perceived that the plaintiff's actions posed an imminent threat. *Id.*

Similarly, the Fifth Circuit in *Garza v. Briones,* 943 F.3d 740 (5th Cir. 2019), held that officers had qualified immunity when they shot a man armed with a BB gun who refused to comply with the officers' orders. The plaintiff in *Garza* argued that the officers gave inconsistent versions of the incident and that an eyewitness security guard declared that the suspect never pointed the gun at the officers. The Fifth Circuit noted that it made sense that the officers' versions would differ slightly since they each had different perspectives of the scene and arrived at different points of the encounter. *Id.* at 747. The Court emphasized that the plaintiff's arguments "fail[ed] to provide adequate deference to defendants' snap judgment, in the heat of a perilous and rapidly evolving situation, about the danger [the suspect] posed." *Id.* at 748.[1] The Court ultimately concluded that a reasonable officer in the defendants' shoes would have believed that the suspect posed a serious threat regardless of the direction that the suspect was pointing the BB gun just before he was shot. *Id.*

In this case, Egal and Johnson did not violate clearly established law but were in fact following clearly established law. The overwhelming weight of the evidence established that Egal and Johnson are entitled to qualified immunity. When viewed from the perspective of a reasonable officer on the scene of this rapidly evolving incident, it was reasonable for Egal and Johnson to believe that Nobles posed an imminent threat of serious bodily harm to Egal, Johnson and others near the scene. The video evidence and physical evidence established that Nobles was armed.

---

[1] The opinion in *Garza* also dispels Plaintiffs' argument at trial that the initial "shots fired" call was only a potential misdemeanor and thus not a serious offense. In *Garza,* the Fifth Circuit noted that one cannot equate "misdemeanor" with "not serious" since it had previously held that a DUI, also a misdemeanor, is a "serious offense" for purposes of evaluating an officer's use of force. *Garza,* 943 F.3d 740, n. 4. The Court noted that if DUI is a serious offense, then unlawfully carrying a firearm is as well. *Id.* Likewise, shooting a firearm into the air in a crowded area is a serious offense.

Plaintiffs' counsel's effort to distract the jury from the evidence with wild and unsupported claims of police conspiracies should not be condoned.   Accordingly, Defendants Richard Egal and Maxwell Johnson respectfully request that the Court enter judgment as a matter of law in their favor and dismiss the Plaintiffs' claims.  Alternatively, Egal and Johnson are entitled to a new trial for these same reasons because the jury's verdict was against the great weight of the evidence.

**IV.     The Court erred in submitting the punitive damages instruction to the jury.**

The Court submitted a punitive damages instruction to the jury and the jury awarded punitive damages in the amount of $187,500.00 against Sergeant Egal and $150,000.00 against Corporal Johnson.  There was insufficient evidence to support a punitive damages instruction.

"A jury may assess punitive damages in a §1983 suit 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Heaney v. Roberts,* 846 F.3d 795, 803 (5th Cir. 2017)(citing *Smith v. Wade,* 461 U.S. 30, 56 (1983).  Reckless indifference is a "subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Id.*

Defendants respectfully submit that the Court erred in submitting the punitive damages instruction.  There was no evidence that Egal and Johnson had an evil motive or intent when they acted on the night of the incident.  There also was no evidence to support a conclusion that Egal and Johnson acted with a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations.  Instead, as discussed fully above, the overwhelming weight of the evidence demonstrated that Egal and Johnson's actions were taken only because they had an objectively reasonable belief that Nobles presented an imminent threat of serious bodily injury or death to themselves and others.  There was no evidence from which a reasonable jury could find the necessary level of evil intent or recklessness necessary to support the punitive damages claim.

As a result, the Court should enter judgment in favor of Egal and Johnson on the punitive damages claim and dismiss those claims with prejudice.

**V.      Plaintiffs' Counsel's blatantly prejudicial and inflammatory remarks during opening statement and closing argument warrant a new trial on liability and damages.**

Jury verdicts on damages may be overturned upon a clear showing of excessiveness or upon a showing that they were influenced by passion or prejudice.  *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1241 (5th Cir. 1985). When a jury verdict results from passion or prejudice, a new trial is the proper remedy.  *Id.*  If passion, prejudice, caprice, or undue sympathy affected both the liability and damages issues, then a new trial as to both issues must be ordered.  *Evers v. Equifax,* 650 F.2d 793, 798 (5th Cir. 1981); *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 283 (5th Cir. 1975).

The Fifth Circuit has noted that while closing arguments must be forceful and, generally, counsel are allowed a "reasonable latitude" in making them, it must reverse in order to preserve substantial justice when improper remarks by counsel cause a jury verdict to be influenced by passion and prejudice. *Whitehead v. Food Max of Mississippi, Inc.,* 163 F.3d 265, 275-76 (5th Cir. 1998); *Hall v. Freeze,* 735 F.2d 956, 962 (5th Cir. 1984); *Westbrook,* 754 F.2d at 1241; *Edwards,* 512 F.2d at 286

Plaintiffs' counsel made a deliberate effort throughout the trial to inflame the jury and appeal to passion and prejudice by making a number of improper statements during opening statement and closing argument.  These statements include the following:

**Opening Statement:**

- "His kinfolk that were down there with him for the birthday celebration that they were going to participate in, they watched him die.  They didn't even get a chance to hold him while he died or console him while he was in his pain.  He bled out like a dog on the street. They didn't get to say goodbye to him."  (Trial Transcript, Vol. 1, p. 132)

- "And they're also going to say that Landon Nobles posed an imminent threat of serious bodily injury to the officers and others even though he was running away.  So we call BS. You know that old game.  We're calling their bluff.  But we're only here and able to call their bluff because several brave people came forward to tell what they saw that night. They're going to ask you to assume that their cockamamy story is completely true."  (Trial Transcript, Vol. 1, p. 133)
- "There were several, several [witnesses] who didn't even come here and aren't going to participate.  But you're going to meet the ones who have elected to participate, and you're going to see that they're just regular folks." (Trial Transcript, Vol. 1, p. 134)

**Closing Argument:**

- "[W]e have to confront this issue head-on because something has to be resolved within the community.  Someone has to speak to when the use of force is appropriate." (Trial Transcript, Vol. 6, p. 106)
- "…[W]e've seen a lot of these kinds of circumstances. We've seen a lot of these kinds of incidents in recent history.  We can go all the way back four or five years and we've had officer-involved shootings.  We can fast-forward and think that we've evolved into better homo sapiens, and yet, guess what? We're still having officer-involved shootings. Nothing's really changed." (Trial Transcript, Vol. 6, p. 106)
- "This time we have civilian witnesses, witnesses who are not encumbered by their personal baggage, witnesses, as I like to say from West Texas, although I've been living here for 25 years, they don't have a dog in the hunt.  These witnesses are the honest brokers of what we know is self-serving testimony provided in every case by police officers when they render a shooting." (Trial Transcript, Vol. 6, p. 107)
- "Let's take, for instance, George Floyd.  Were it not for a bystander, they would have gotten away with that. We have a similar situation here." (Trial Transcript, Vol. 6, p. 107)
- "…[The bystanders] still mustered the intestinal fortitude to come here and tell you what they saw and some of those people did so in great fear." (Trial Transcript, Vol. 6, p. 107-108)
- "The plaintiffs [sic] set out with a pernicious plan to dehumanize Landon Nobles, to demonize Landon Nobles. They called him suspect, the subject, they never called him by his name, not one time.  That's disturbing.  But I'll say it. Landon Nobles is the son of Ida Renae Nobles, and may he rest in peace." (Trial Transcript, Vol. 6, p. 111)
- "Mr. Laird is a lawyer for the City, and it's the City of Austin who's defending the cops in this action." (Trial Transcript, Vol. 6, p. 111)
- "…a class A misdemeanor does not merit a death penalty, does not." (Trial Transcript, Vol. 6, p. 117)
- "…Detective Boline was lazy, frankly.  He's got the power and the weight of the entire Austin Police Department and the judiciary to go out and get Elvis [Ingram] and bring him in to give a clarification if he needs a clarification…" (Trial Transcript, Vol. 6, p. 120)
- "Detective Boline, I'd like to say he reminds of the Cheshire cat when he sat up there, kind of Alice in Wonderland, Through the Looking Glass, when up is down is up, just completely ignored the civilian witnesses." (Trial Transcript, Vol. 6, p. 122)
- "And it's hard to sit in judgment of nice guys, but you're not sitting in judgment where they're going to lose their jobs or they're going to prison.  You're sitting in judgment on

whether or not the City is going to pay out for their mistakes when they were their agents." (Trial Transcript, Vol. 6, p. 123)

- "There were rules that govern when and where and whether they can do this or that as a police officer just like a soldier is governed by the rules of the Geneva Convention, and when the use of deadly force occurs, unfortunately in this country, and certainly in this city, your work is going to get graded.  Because it's in those cases like that where we, the people, through you, the jury, grade those papers." (Trial Transcript, Vol. 6, p. 124)
- "Cops are rarely held—police officers are rarely held accountable these days, but they always seem to help each other out, cover each other's back.  Why does this keep happening?" (Trial Transcript, Vol. 6, p. 139)
- "Well, I want you to think about, you, the people, is that five years from now, 10 years from now, 20 years from now, your decision in this case is going to live with you for the rest of your life and it's going to color how police officers engage with citizens. This is a very important thing that you're here to do.  You will remember this deliberation for the rest of your lives. You're going to look back on it and you're going to see exactly, in many years, what your role was and what role you played in it, and I'll tell you that the buck stops right here with you, the people.  The buck stops here." (Trial Transcript, Vol. 6, p. 139-140)
- "You need to condemn the police for shooting this guy in the back.  Now, why did they do that? Well, there's a thin blue line." (Trial Transcript, Vol. 6, p. 140)
- "Sometimes the only way to get a city to change its behavior is by socking them in the pocketbook." (Trial Transcript, Vol. 6, p. 141)
- "This was a terrible experience and it did not have to be.  You must make the City pay for that; otherwise, we're going to go into the future with more George Floyd style incidents, more Landon Nobles style incidents and that poses a very grave danger…" (Trial Transcript, Vol. 6, p. 141-142)

a.   **George Floyd incident and community conscience argument**

First, Plaintiffs' counsel's references to the nationally-known George Floyd incident in Minnesota were highly improper and designed solely to inflame the jury.  The Nobles incident and the George Floyd incident are not remotely similar to each other, and no evidence was presented at trial which made any connection between the two incidents.  The statements made during closing argument that "something has to be resolved within the community" and that more incidents like the George Floyd incident will occur unless the jury makes the City pay in this case served no proper purpose and were made solely to inflame the jury. These statements, along with many others

outlined above, constitute improper conscience of the community arguments which have long been condemned by the Fifth Circuit and other courts.

In *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1238 (5th Cir. 1985), the Fifth Circuit held that it was reversible error for Plaintiff's counsel to argue to the jury in closing: "You are going to be the conscience of the community with this verdict."  The Court stated that its condemnation of a "community conscience" argument is not limited to the use of those specific words.  *Id. at 1238-39.* Instead, it extends to all "impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation." *Id.* at 1239.  Similarly, the Fifth Circuit in *Whitehead v. Food Max of Mississippi, Inc.,*163 F.3d 265, 277 (5th Cir. 1998) stated: "Arguments which invite a jury to act on behalf of a litigant become improper 'conscience of the community' arguments when the parties' relative popular appeal, identities, or geographical locations are invoked to prejudice the viewpoint of the jurors." *Id.,* quoting  *Guaranty  Service Corp. v. American Employers' Ins. Co.,* 893 F.2d 725, 729 (5th Cir. 1990).

Here, Plaintiff's counsel engaged in similar behavior as counsel in *Westbrook* and *Whitehead*.  Plaintiff's counsel's statements during closing arguments that "we've seen a lot of these kinds of incidents in recent history" and "five years from now, 10 years from now, 20 years from now, your decision in this case is going to live with you for the rest of your life and it's going to color how police officers engage with citizens" serve no purpose other than to inflame the jury and, in effect, place a responsibility on the jury to affect change in the interaction between police and citizens.  Plaintiff's counsel continued this improper argument by stating: "You're going to look back on it and you're going to see exactly, in many years, what your role was and what role you played in it, and I'll tell you that the buck stops right here with you, the people.  The buck stops here." (Trial Transcript, Vol. 6, p. 139-140) He then doubled-down and argued: "[y]ou must

make the City pay for that; otherwise, we're going to go into the future with more George Floyd style incidents, more Landon Nobles style incidents and that poses a very grave danger…" (Trial Transcript, Vol. 6, p. 141-142)  These arguments are not close to being fair comments on the evidence.  Instead, they are appeals to the jury's conscience intended to place a duty and responsibility on the jury to affect the future actions not only of the parties in this case, but other police officers as well.  As such, they are improper arguments and warrant a new trial.

Plaintiff's counsel's arguments in this case are similar to arguments made in *Brownlee v. United Fidelity Life Ins. Co.,* 117 F.R.D. 383 (S.D. Miss. 1987), where the district court ordered a new trial on liability and damages based on highly prejudicial arguments by plaintiff's counsel. There, plaintiff's counsel's closing argument included statements such as: "You are going to tell them what they are going to do.  You are going to send them a message…"  and "[w]e want you to tell this insurance industry, 'Change directions'" *Id.* at 386-87.  Counsel in *Brownlee* continued: "But anyway, I am going to ask you to bring back enough money, at your sole discretion, to get the attention of this company to encourage it not to do these kind of things, but to get the attention of the entire insurance industry…" *Id.* at 388.  The district court held that this argument was improper and "[b]ecause [plaintiff's counsel] chose to inflame the jury, rather than inform it, a complete new trial is the only adequate remedy." *Id.* at 390. The improper arguments in *Brownlee, Whitehead* and *Westbrook* are no different than the improper arguments made in this case, and thus a new trial is required.

b.    **Appeals to Emotion and Passion**

The Fifth Circuit in *Whitehead*, 163 F.3d at 276, noted that "awards influenced by passion and prejudice are the antithesis of a fair trial." The Court noted that particularly in emotional cases which involve emotional distress damages, "counsel must be unusually vigilant and take the

greatest care to avoid and prevent such appeals [to emotion], in order to keep the verdict from being infected by passion and prejudice." *Id.* The Fifth Circuit in *Whitehead* found that plaintiff's counsel improperly appealed to the jury's emotion and argued outside the evidence when he told the jury that the plaintiffs stayed outside of the courtroom throughout the trial other than to testify since it was too painful for them to listen to the "horrors and events of what happened in the liability testimony" and that one of the plaintiff's last thought before death would be of the rapists. *Id.* at 277. Similarly, the Fifth Circuit in *Edwards*, 512 F.2d at 285-86, reversed a jury verdict where, during closing argument during a wrongful death case, plaintiff's counsel invoked images of the decedent's children crying at the grave and waiting for their father on the porch steps. *See also Schleunes v. American Cas. Co. of Reading, Pa.,* 528 F.2d 634, 638 (5th Cir. 1976).

Here, Plaintiff's counsel began his appeal to emotion and passion in the opening statement when he stated: "[h]is kinfolk that were down there with him for the birthday celebration that they were going to participate in, they watched him die. They didn't even get a chance to hold him while he died or console him while he was in his pain. He bled out like a dog on the street. They didn't get to say goodbye to him." (Trial Transcript, Vol. 1, p. 132) Plaintiff's counsel continued his efforts to appeal to emotion in his closing argument, stating: "The plaintiffs [sic] set out with a pernicious plan to dehumanize Landon Nobles, to demonize Landon Nobles. They called him suspect, the subject, they never called him by his name, not one time. That's disturbing. But I'll say it. Landon Nobles is the son of Ida Renae Nobles, and may he rest in peace." (Trial Transcript, Vol. 6, p. 111) Counsel also stated that Nobles' estate should be awarded pain and suffering damages when "he laid there looking at the police officers asking them, 'Why did you shoot me? Stop shooting me.'" (Trial Transcript, Vol. 6, p. 140) These statements serve no purpose other than

to appeal to emotion and passion and lead to the conclusion that these emotional appeals had an influential impact on the jury's decision.

c.      **References to "facts" not in evidence**

Plaintiff's counsel also made several statements in his closing argument regarding facts not in evidence which cannot be considered fair comment on the evidence.  This practice has resulted in remand for new trials by the Fifth Circuit and grants of new trials by district courts.  *See Whitehead*, 163 F.3d at 277-78; *Edwards*, 512 F.2d at 284; *Jones v. City of Atlanta*, 647 F.2d 580, 586 (5th Cir. 1981); *see also Alexander v. City of Jackson, MS, 2008 WL 907658 *5, S.D. Miss. March 31, 2008 (not reported in F.Supp.2d).*

Here, Plaintiff's counsel on several occasions during closing arguments referenced matters outside the evidence, all of which were prejudicial.  For example, counsel argued: "We've seen a lot of these kinds of incidents in recent history.  We can go all the way back four or five years and we've had officer-involved shootings." (Trial Transcript, Vol. 6, p. 107) Similarly, counsel argued: "…what we know is self-serving testimony provided in every case by police officers when they render a shooting." (Trial Transcript, Vol. 6, p. 107) He also argued: "Cops are rarely held—police officers are rarely held accountable these days…" (Trial Transcript, Vol. 6, p. 139) Simply put, there is no evidence in the record to support any of these statements and their obvious purpose was to insert extrajudicial information into the jury's deliberations and further inflame the jury.

Counsel also stated that witnesses were afraid to come forward and testify because they were in fear for their safety.  He started this tactic in opening statements (Trial Transcript, Vol. 1, pp. 129; 134) and then in closing arguments continued: "…[The bystanders] still mustered the intestinal fortitude to come here and tell you what they saw and some of those people did so in

great fear." (Trial Transcript, Vol. 6, p. 107-108) No evidence supports these statements, and they serve no purpose other than to imply that the witnesses somehow were intimidated by the police.

**d.      Improper references to the City of Austin defending and indemnifying the officers**

Even though the Plaintiffs' claims against the City of Austin were dismissed long before trial, Plaintiffs' counsel made several arguments explicitly stating that the City was defending the case and that the jury needed to make the City pay.  Counsel argued: "it's the City of Austin who's defending the cops in this action." (Trial Transcript, Vol. 6, p. 111) He later argued: "[y]ou're sitting in judgment on whether or not the City is going to pay out for their mistakes when they were their agents." (Trial Transcript, Vol. 6, p. 123) Not satisfied, Plaintiffs' counsel continued: "Sometimes the only way to get a city to change its behavior is by socking them in the pocketbook," and "this was a terrible experience and it did not have to be.  You must make the City pay for that…" (Trial Transcript, Vol. 6, p. 141-142)

Such statements are akin to arguing that a defendant has liability insurance, which is both inadmissible as evidence and improper argument.  *Fed.R. Evid. 411.*  Additionally, this argument is improper because it in essence is claiming that the City should be punished in order to get the City to change its behavior.  Again, Plaintiffs were not asserting a claim against the City at trial and this argument was simply an attempt to inject the City's financial responsibility into the trial.

The Ninth Circuit held that a new trial was required when counsel stated in closing argument that the City of Los Angeles was indemnifying a police officer in a §1983 action for wrongful detention and responsible for damages awarded.  *Larez v. Holcomb,* 16 F.3d 1513, 1520-21 (9th Cir. 1994).  There, the Court stated: "[i]n this case, having been told that [the officer] would not bear the burden of a damages award, the jury might have been tempted, out of sympathy for [the plaintiff], to inflate the award beyond the amount necessary to compensate her." *Id.* at 1519.

Likewise, the statements made by counsel in this case regarding the City's financial responsibility were improper and served no purpose other than to inflame the jury to award an inflated verdict.

**e.      The improper statements require a new trial on liability and damages.**

Impropriety of closing arguments may be inferred from the excessiveness or inadequacy of the verdict amount. *Evers v. Equifax,* 650 F.2d 793, 798 (5th Cir. 1981).  In *Whitehead,* the Fifth Circuit stated: "[t]hat the awards were improperly influenced by passion and prejudice is indicated by their size…This large verdict, when accompanied by counsel's improper arguments, further indicates that the jury was influenced by the prejudicial statements." *Whitehead,* 163 F.3d at 278; *see also Westbrook,* 754 F.2d at 1241. Likewise, here, the size of the jury's verdict clearly indicates that the numerous improper statements and arguments of counsel influenced the jury.

If passion, prejudice, caprice, or undue sympathy affected both the liability and damages issues, then a new trial as to both issues must be ordered.  *Evers v. Equifax,* 650 F.2d 793, 798 (5th Cir. 1981); *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 283 (5th Cir. 1975). In this case, the passion and prejudice caused by the improper arguments affected both liability and damages. Liability was far from clear in this case, and it is not difficult to understand how the improper references to the George Floyd incident, among others, could influence the jury on the liability issue.  An argument that the City must pay in order to prevent more George Floyd incidents without doubt influenced the jury's liability decision as well as its decision on damages.  As a result, the Court should grant a complete new trial.

**VI.      The Damages Award was Excessive, Unjust, and Not Supported by the Evidence.**

Damages awarded by the fact finder that are "clearly erroneous or so gross or inadequate as to be contrary to right reason" should be overturned or reduced.  *Thompkins v. Belt*, 828 F.2d 298, 301 (5th Cir. 1987); *see also Polanco v. City of Austin, Tex.*, 78 F.3d 968, 981 (5th Cir. 1996).

Although a court generally should defer to a jury's verdict on damages, that deference must be abandoned when the court is convinced that the damages were clearly excessive. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). While a court generally has discretion whether to grant a new trial or remit the damages when faced with an excessive verdict, a new trial should be awarded (rather than remittitur) when an excessive damages award results from passion or prejudice. *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985); *Polanco*, 78 F.3d at 981 (citing *Lowe v. General Motors Corp.*, 624 F.2d 1373, 1383 (5th Cir. 1980)).

Compensatory damages awarded pursuant to §1983 are governed by common law tort principles. *Keyes v. Lauga*, 635 F.2d 330, 336 (5th Cir. 1981). "[T]he abstract value of a constitutional right may not form the basis for §1983 damages." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308 (1986). Compensatory damages under §1983 are therefore designed to *compensate* someone based on their actual losses. Any damages awarded beyond that—whether based on punishment, the value of the constitutional right, or the notion of "sending a message"—are excessive. *Id.*

Even within these bounds, a jury award "is excessive if it is contrary to right reason or entirely disproportionate to the injury sustained." *Eiland*, 58 F.3d at 183 (internal quotes and citation omitted). "While pain and suffering is, to a large degree, not susceptible to monetary quantification, and the jury thus necessarily has especially broad leeway, nevertheless, the sky is simply not the limit." *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1428 (5th Cir. 1988) (internal punctuation and citation omitted). Similarly, jury awards for mental anguish damages, although largely based on the subjective experience of the plaintiff, may be remitted or overturned entirely

when they are excessive based on the evidence presented.  *See Giles v. General Electric Co.*, 245

F.3d 474, 488 (5th Cir. 2001).

    In this case, the jury awarded damages to the Plaintiffs as follows:

Landon Nobles
* $3,670,000.00 for physical pain and mental anguish experienced by Landon Nobles

Plaintiff Ida Renae Nobles
* $2,000,000.00 for past loss of companionship and society
* $4,300,000.00 for future loss of companionship and society
* $3,500,000.00 for past mental anguish
* $7,000,000.00 for future mental anguish

Plaintiff K.N., a minor, by and through his guardian Kadeidra Bell
* $500,000.00 for past loss of companionship and society
* $11,200,000.00 for future loss of companionship and society
* $250,000.00 for past mental anguish
* $11,200,000.00 for future mental anguish

Plaintiff L.N., a minor, by and through his guardian Michelle Dashaun Smith
* $500,000.00 for past loss of companionship and society
* $11,200,000.00 for future loss of companionship and society
* $250,000.00 for past mental anguish
* $11,200,000.00 for future mental anguish

    These awards are clearly excessive and were the result of improper passion and prejudice.

Thus, a new trial should be ordered.   Alternatively, the Court should substantially remit the

damages.

**A.    Landon Nobles**

    First, the award of $3,670,000.00 for physical pain and mental anguish of Landon Nobles

prior to his death is clearly excessive and not supported by the evidence.  No evidence was

presented at trial regarding how long Nobles survived after the shooting.  Sergeant Egal heard

Nobles make one statement when he approached Nobles after the shooting and then within

seconds, Officer Pena and other officers began performing CPR on Nobles after he lost

consciousness.   There is no evidence that Nobles regained consciousness after the officers began

life-saving measures.  A damages award for pre-death mental anguish cannot stand when the only evidence to support it is speculative or purely conjectural.  *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 288 (5th Cir. 1974); *Calderera v. Eastern Air Lines,* 529 F. Supp. 634, 640 (W.D. La. 1982); *see also Vogler v. Blackmore,* 352 F.3d 150, 160 (5th Cir. 2003)(award of $200,000 to estate of deceased for pain and suffering and mental anguish prior to death excessive).

**B.     Damages awarded to Ida Renae Nobles**

The jury's awards to Landon Nobles' mother, Ida Renae Nobles, for past and future loss of companionship and society are clearly excessive and suggest that the awards were the result of bias, passion and prejudice.  Ms. Nobles testified at trial, and although she was a sympathetic witness and misses her son, the evidence presented at trial does not support awards totaling $6,300,000.00 for past and future loss of companionship and society.  Ms. Nobles testified that she and Landon Nobles lived with her parents, and Landon Nobles would occasionally help out with household expenses.  (Trial Transcript, Vol. 3, p. 88)  He also helped take out the trash and performed yard work.  (Trial Transcript, Vol. 3, p. 87)  Ms. Nobles also testified that she misses her son and that the family does not gather together as much at holidays.  (Trial Transcript, Vol. 3, p. 85)

The Fifth Circuit and other courts have found lesser awards to parents for the loss of companionship and society of their children to be excessive.  In *Haley v. Pan American World Airways, Inc.,* 746 F.2d 311, 318-319 (5th Cir. 1984), the Fifth Circuit held that awards of $350,000 each to parents for the loss of companionship and society of their 25 year old son were excessive. The Fifth Circuit has also affirmed awards for parents for the loss of companionship and society of a child that were higher than the award in *Haley* but still much lower than the award in this case. In *Vogler v. Blackmore,* 352 F.3d 150 (5th Cir. 2003), the plaintiff's wife and 3 year old daughter

were killed in a motor vehicle accident. The Fifth Circuit affirmed an award of $200,000 for past loss of companionship and mental anguish and $1,300,000.00 for future loss of companionship and mental anguish for the loss of plaintiff's daughter. *Id.* at 157-58; *see also Grandstaff v. City of Borger, Tex.,* 767 F.2d 161, 172 (5th Cir. 1985)(father of adult son shot by police awarded $200,000 for loss of companionship and mental anguish).   The $6.3 million award to Ms. Nobles solely for loss of companionship and society is excessive and reflects passion and prejudice.   As a result, a new trial should be granted.

Likewise, the awards to Ms. Nobles of $3,500,000.00 for past mental anguish and $7,000,000.00 for future mental anguish are clearly excessive.   Ms. Nobles trial testimony, while certainly sympathetic, does not support an award of $10,500,000.00 for mental anguish, and like the other awards, strongly indicates that the jury was influenced by passion and prejudice.   The mental anguish award for Ms. Nobles in this case is much higher than the award approved in *Vogler* which included both mental anguish and loss of companionship and society.

Ms. Nobles' total award of $16,800,000.00 also greatly exceeds the post-remittitur amount awarded to two parents who lost their 18 year old daughter in a motor vehicle accident in *Frazier v. Honeywell Intern., Inc.,* 518 F.Supp.2d 831 (E.D. Tex. 2007).   In *Frazier,* the jury awarded both parents a total of $24,000,000.00 for their past and future loss of companionship and mental anguish.   *Id.* at 835.   The district court's opinion on the defendant's post-trial motions described the father's testimony as being "as compelling and moving as any this judge has heard in over 30 years as a civil trial attorney and judge."   *Id.* at 844.   The district court nonetheless granted a remittitur to a total recovery of $9.75 million ($4,875,000 to each parent for past and future loss of companionship and mental anguish). *Id.* The jury's award to Ms. Nobles is excessive and clearly indicates that the jury was guided not by the evidence but instead by passion and prejudice.

Accordingly, the Court should grant a complete new trial, or alternatively, substantially remit the damages.

**C.     Damages awarded to Landon Nobles' minor children**

The jury in this case awarded identical $23,150,000.00 awards to Nobles' minor sons. These awards are clearly excessive, not supported by the evidence and demonstrate that the jury was inflamed by passion and prejudice.  The testimony at trial revealed that Nobles' sons, K.N. and L.N. were both two years old at the time of Landon Nobles' death and at the time of trial were six years old.  (Trial Transcript, Vol. 3, p. 85; 100) Kadeidra Bell, K.N.'s mother, testified that Nobles was a good father and spent time with K.N. (Trial Transcript, Vol. 3, p. 100-101) She also testified that Nobles contributed by helping her with diapers.  (Trial Transcript, Vol. 3, p. 104) Ida Renae Nobles testified that both boys know that their father loved them. (Trial Transcript, Vol. 3, p. 95) According to Bell, a step-father has assumed a father-figure role for K.N. and he and K.N are very close. (Trial Transcript, Vol. 3, p. 102) Plaintiff Michelle Dashaun Smith, the mother of L.N., did not testify at trial so the only testimony regarding Landon Nobles' relationship to L.N. was the testimony of Ida Renea Nobles and Kadeidra Bell.

The testimony of Ida Renae Nobles and Kadeidra Bell regarding Landon Nobles' relationships with his sons does not support awards of over $23 million to each son and these awards are clear evidence that the jury decided the case based on passion and prejudice.  To recover damages for future mental anguish, a plaintiff must present evidence demonstrating a reasonable probability that the plaintiff will suffer mental pain and distress in the future that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Wackman v. Rubsamen,* 602 F.3d 391, 408 (5th Cir. 2010), citing *Adams v. YMCA of San Antonio,* 265 S.W.3d 915, 916-17 (Tex. 2008).  Plaintiffs here produced no evidence at trial sufficient to meet this standard.

The Fifth Circuit has reversed a number of cases awarding damages to children for the loss of a parent which were far less than the damages awarded to K.N. and L.N. in this case.  For example, the Court in *Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 785 (5th Cir. 1983) found that an award of $400,000 to a four year old child for the death of his mother was excessive and remitted the award to $300,000.

Similarly, the Fifth Circuit in *Douglass v. Delta Air Lines, Inc.,* 897 F.2d 1336, 1345 (5th Cir. 1990), affirmed recoveries ranging from $50,000 to $100,000 for mental anguish of three minor children for the sudden death of a parent which they did not witness but found that each child's recovery for the loss of companionship of the parent could not far exceed $200,000 so the aggregate sum for each child would not exceed $300,000.  *See also Grandstaff,* 846 F.2d 1016 (5th Cir. 1988)(minor child recovered $250,000 total for loss of society and mental anguish when her father was killed by police).

In *Wackman,* 602 F.3d at 408, the Fifth Circuit reversed awards of $75,000 to one daughter and $50,000 each to two other daughters in a wrongful death case when there was insufficient evidence of future mental anguish.  Similarly, in this case, there was no evidence at trial to support awards of over $11 million to both K.N. and L.N. for future mental anguish.  A review of the trial testimony of Ida Renae Nobles and Kadeidra Bell reveals that there was no evidence that the jury could base the extremely high awards for future mental anguish and future loss of companionship and society on and that these awards are excessive and the result of passion and prejudice.  As a result, the Court should grant a complete new trial, or alternatively, substantially remit the damages.

**VII.    The Court erred in admitting impeachment testimony concerning Defendants' firearms expert.**

At trial, Plaintiffs attempted to cross examine Defendants' firearms expert, Greg Karim, regarding an Austin Police Department disciplinary proceeding which occurred in July 2018, over one year after he performed the firearms testing and examination for this incident.  The disciplinary proceedings involved alleged dishonesty in a personnel matter and had nothing to do with Karim's firearms investigations, collection of evidence or dishonesty in testimony regarding firearms examinations. While the Court correctly determined that in-depth questioning and extrinsic evidence of the disciplinary proceeding was inadmissible under Fed. R. Evid. 403, the Court permitted Plaintiffs to ask Karim: "Now isn't it true, Mr. Karim, that you resigned from your duties in the Austin Police Department, and you resigned in lieu of discharge for being dishonest in relation to a personnel matter?" (Trial Transcript Vol. 4, p. 265) Karim responded: "Yes.  That's true." (Trial Transcript Vol. 4, p. 265)

Defendants respectfully submit that the Court erred in admitting this testimony.  This evidence was inadmissible under Fed. R. Evid. 402 since it had no relevance to Karim's testing and examination performed for this incident or his current or prior trial testimony.  Any alleged probative value to Karim's credibility was substantially outweighed by the danger of unfair prejudice to Karim and the Defendants and the potential of misleading the jury and thus was inadmissible under Fed. R. Evid. 403.   Plaintiffs did not dispute Karim's actual findings concerning his examination of the firearms evidence in this case, and this effort to impeach Karim about a collateral matter that occurred long after his examination of the evidence was solely designed to mislead the jury.  As a result, this evidence should not have been admitted.

**VIII.   Plaintiffs did not meet their burden of demonstrating that the Defendants'
peremptory strike of Juror Number 5 was based on the potential juror's race, and
there was no finding of purposeful discrimination.**

At the conclusion of jury selection, Plaintiffs asserted a *Batson* challenge to Defendants'
use of a peremptory strike on Trial Juror Number 5, who at the time was Potential Juror Number
10. Plaintiffs argued that Potential Juror Number 10 was the only African-American on the jury
panel and that the Defendants removed him because of his race.  *Batson v. Kentucky*, 476 U.S. 79
(1986).

A *Batson* challenge involves three procedural steps: (1) the "[opponent of the strike] must
make a prima facie showing that a peremptory challenge has been exercised on the basis of
race"; (2) the [striking party] "must offer a race-neutral basis" for the strike; and (3) "the trial
court must determine whether the [striking party] has shown purposeful discrimination." *Snyder
v. Louisiana*, 552 U.S. 472, 476--477 (2008). This final step involves evaluating "the
persuasiveness of the justification" proffered by the [striking party], but "the ultimate burden of
persuasion regarding racial motivation rests with, and never shifts from, the opponent of the
strike." *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995) (per curiam); see *United States v.
Bentley--Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993).

During voir dire, two potential jurors -- Number 10 and Number 11-- sitting side by side,
revealed that they had each previously been arrested.  Potential Juror No. 10 stated that he had
been arrested for possession of marijuana. Potential Juror No. 11 stated that he had also
previously been arrested a long time ago and he could not remember the exact charges, but he
thought resisting arrest was involved. Defendants used peremptory strikes on both of them.
Plaintiffs did not object to the peremptory strike of Potential Juror No. 11, but they raised a
*Batson* challenge with regard to Potential Juror No. 10. Defense counsel explained that he had

used a strike against Potential Juror No. 10 because he had previously been arrested, and because of his employment as a security guard. Two of the witnesses in the case were also security guards with expected testimony somewhat in conflict with the defendants. Defense counsel explained that both reasons were race-neutral, and for comparison he pointed out the exact same treatment of Potential Juror No. 11 who had also been arrested, and who was literally sitting side by side with Potential Juror No. 10. The Court denied the peremptory strike of Potential Juror No. 10, explaining that the Defendants' reasons for the strike were not sufficiently race-neutral. (Trial Transcript, Vol. 1, pp. 105-106).

"On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. at 477; see *United States v. Kennedy*, 707 F.3d 558, 568 (5th Cir. 2013) (*Batson* rulings reviewed for "clear error"). The Fifth Circuit has held that it "must give great deference to the district court because findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the [peremptory] challenge." *Kennedy*, 707 F.3d at 568.

Respectfully, Defendants submit that the Court erred since there was no actual determination of purposeful discrimination by Defense counsel. Instead, the Court evaluated the reasons for the peremptory strike similarly to a challenge for cause, which is a higher standard than is proper for evaluating a party's decision to exercise a peremptory strike. Defendants submit that it is not at all unusual for individuals to come to different conclusions in evaluating potential jurors, and that the difference in impression of the potential juror between the Court and Defense counsel in this case does not indicate that the Defendants' reasons were pretextual. There was no finding that the Defendants peremptory challenge was exercised on the basis of race. The result was to relieve the Plaintiffs of their "ultimate burden of persuasion regarding

racial motivation" as the opponents of the peremptory strike. *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995) (per curiam); see *United States v. Bentley--Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993).

Indeed, Defendants respectfully submit that the record amply demonstrates a race-neutral basis for the exercise of this peremptory challenge. As noted above, only two potential jurors, Number 10 and Number 11 (not an African American), had previously been arrested and Defendants used peremptory strikes on both of them. Other than initially raising the Batson challenge as to Number 10, Plaintiff's counsel did not make any additional comments, and Plaintiffs did not offer any support or additional proof for their contention of purposeful discrimination.

In sum, the Plaintiffs did not meet their burden of demonstrating that the Defendants' attempted peremptory strike Potential Juror No. 10 (Trial Juror Number 5) was based on race. Consequently, it is clear that there was no finding of purposeful discrimination, and the Court's denial of Defendants request to excuse Potential Juror No. 10 was clearly erroneous.

## CONCLUSION

For the reasons set forth above, Defendants Richard Egal and Maxwell Johnson respectfully request that the Court grant their motion for judgment as a matter of law and dismiss the Plaintiffs' claims against them with prejudice. Alternatively, Defendants respectfully request that the Court order a new trial on liability and damages or alternatively, remit the damages awarded by the jury to a reasonable damages award. Defendants further request any additional relief to which they may be entitled.

RESPECTFULLY SUBMITTED,
ANNE L. MORGAN, CITY ATTORNEY
MEGHAN RILEY, CHIEF OF LITIGATION

/s/   H. Gray Laird III
H. GRAY LAIRD III
Assistant City Attorney
State Bar No. 24087054
gray.laird@austintexas.gov
Monte L. Barton
Assistant City Attorney
State Bar No. 24115616
Monte.barton@austintexas.gov
City of Austin Law Department
P.O. Box 1546
Austin, Texas 78767-1546
Telephone: (512) 974-1342
Facsimile: (512) 974-1311

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that, on the 4th day of February 2022, I served a copy of this document on all parties, by and through their attorneys of record, in compliance with the Federal Rules of Civil Procedure.

**Via CM/ECF:**
Edmund Davis
State Bar No. 24028272
attorney.skip.davis@gmail.com
LAW OFFICE OF EDMUND DAVIS
P.O. Box 201123
Austin, Texas 78720
Telephone: (512) 698-2215

Charles Medearis
State Bar No. 24044896
cmedearislaw@gmail.com
LAW OFFICE OF CHARLES MEDEARIS
710 W 14th Street, Suite C
Austin, Texas 78701
Telephone: (512) 524-0814

**ATTORNEYS FOR PLAINTIFFS**