UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IDA RENAE NOBLES, INDIVIDUALLY, K.N., MINOR, BY AND THROUGH HIS GUARDIAN KADEIDRA BELL & L.N., MINOR, BY AND THROUGH HIS GUARDIAN, MICHELLE DASHAUN SMITH AS HEIRS AT LAW TO THE ESTATE OF LANDON NOBLES, | § § § § § § § § | |
| Plaintiffs, | § | A-19-CV-389-ML |
| V. | § § | |
| SERGEANT RICHARD EGAL AND CORPORAL MAXWELL JOHNSON, | § § | |
| Defendants. | § | |

## ORDER

Before the court are Plaintiffs' Motion for Attorney Fees (Dkt. #77), Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, for New Trial or Remittitur (Dkt. #86), and all related briefing. Having reviewed the docket, all relevant briefing, and considered the arguments of the parties made at trial and at the hearings, the court enters the following order.

## I.   FACTUAL BACKGROUND

This case involves the fatal shooting of twenty-four-year-old Landon Nobles ("Nobles") by Austin Police Officers Sergeant Richard Egal ("Egal") and Corporal Maxwell Johnson ("Johnson"). On the evening of May 7, 2017,[1] Nobles went to the entertainment district on Sixth Street in downtown Austin, Texas to celebrate a birthday with friends. At approximately 2:30 a.m., just after closing time for the bars, Austin Police Department received reports of a single gunshot

---

[1] On the weekend of May 7, 2017, the annual Pecan Street Festival was also being held in downtown Austin, Texas on Sixth Street.

fired into the air in front of the Mooseknuckle Pub, by an individual described as a black male wearing a white shirt with a "Air Jordan" logo and blue shorts.

Johnson and several other officers were responding to the radio report by heading toward the Mooseknuckle Pub when they encountered an individual who matched the suspect's description—later determined to be Nobles—around the intersection of Sixth Street and Trinity Street. As Johnson and the other officers approached Nobles, he took off running north up Trinity and the officers began pursuit. Egal was separately responding to the report when he encountered Nobles running from the officers on Trinity. In an effort to stop Nobles, Egal pushed his bicycle in Nobles' path which caused Nobles to stumble to the ground momentarily. At this point, the testimony varies as to what exactly happened during the officers' pursuit of Nobles. The jury heard the following accounts from testifying witnesses.

Defendant Johnson testified that he was "100 percent positive" he saw a handgun in Nobles' right hand while he was running on Trinity Street. Tr. Vol. 5 at pp. 50-60. Johnson further testified that he saw Nobles point the gun over his shoulder and take a shot at him, and that Johnson heard and saw the gun's muzzle flash. *Id*. Johnson testified that he fired his weapon at Nobles twice before Nobles fell to the ground, at which time Johnson saw a gun fall to the ground near Nobles' feet. *Id*. at p. 61.

Defendant Egal testified that after he pushed the bicycle and Nobles stumbled, Egal heard a distinct clatter sound and saw a small pistol in Nobles' right hand. Tr. Vol. 6 at pp. 25-36. Egal testified that he "clearly saw a gun," and responded by drawing his own weapon and firing at Nobles three times. *Id*. at pp. 26-27. Egal stated that after Nobles fell to the ground, Egal went up and instructed Nobles to show his hands and Nobles complied by putting his hands up to show that his hands were clear. *Id*. at p. 31.

One of the other officers chasing Nobles on Trinity Street, Officer Anthony Allegretti, testified that he could not see Nobles' hands clearly, and that at no point did he see Nobles with a gun in his hands, nor did he see Nobles turn back or point anything. Tr. Vol. 2 at pp. 188-196. Allegretti further stated that he never drew his firearm during the chase, and instead pulled out his taser. *Id*. at p. 184.

Officer Steven Pena, another one of the officers involved in the chase of Nobles on Trinity Street, testified that he saw a gun in Nobles' hand after Nobles stumbled on the bicycle. Tr. Vol. 3 at pp. 178-182. Pena stated that he heard a gunshot come from Nobles' direction after he tripped on the bicycle, and further stated that he believed he saw Nobles begin to reach over his shoulder behind him after he continued running. *Id*. at pp. 181-183. Pena testified that he drew his service weapon during the chase but did not fire it. *Id*. Pena also testified that after Nobles was on the ground and handcuffed, Pena saw a handgun at Nobles' feet. *Id*. at p. 181.

The jury also heard from Officer Uri Tamez, who testified that he saw Nobles stumble on the bicycle, and that after Nobles got up and continued running, Tamez saw Nobles turn his body and point a handgun at the officers. Tr. Vol. 3 at pp. 227-233. Tamez stated that Nobles began shooting at the officers chasing him and that he saw the muzzle flash and heard approximately one or two shots. *Id*. at pp. 229, 231. Tamez testified that he drew his weapon before hearing Johnson and Egal begin firing their weapons. *Id*.

A sound technician working on Sixth Street that evening who was an eyewitness to the incident testified that he was close by, that he had an unobstructed view of Nobles' hands, and that he is certain Nobles was not holding a gun. Tr. Vol. 1 at pp. 160-162, 182-184, 189 ("I saw there was no weapon in his hands.").

Royie Nobles, Landon Nobles' cousin who was with him on Sixth Street that evening, testified that he witnessed Nobles take off running from the officers on Trinity, that he heard a

"pop" after Nobles stumbled over the bicycle, and then heard several more "pops" after Nobles got back up and continued running. Tr. Vol. 1 at pp. 249-251. According to Royie Nobles, he had an unobstructed view of Nobles and "[n]othing was in his hands." *Id*. at p. 251. Royie Nobles further testified that, as far as he knew, Landon Nobles did not have a gun with him that evening. *Id*. at p. 252.

The jury also heard from two security guards patrolling Sixth Street that evening. The first security guard testified that he saw Nobles running on Trinity, saw Nobles trip over the bicycle, and specifically testified that Nobles did not turn toward the officers chasing him until after he had been shot, just before Nobles fell to the ground. Tr. Vol. 2 at pp. 40-42. The first security guard also stated that he could clearly see Nobles' hands and that he saw nothing in them, and that at no point did he see Nobles point anything at the officers. *Id*. at pp. 42, 47.

The second security guard testified that he witnessed the chase on Trinity and that he did not look at Nobles' hands specifically, but that he did not think Nobles was holding anything while running. Tr. Vol. 2 at pp. 100-101. The second security guard further testified that after Nobles stumbled over the bicycle, he heard a pop, which he recognized as a gunshot sound. *Id*. at pp. 124-126. He stated that Nobles then got back up and continued running, and that at some point Nobles slightly "hunched" his body to look behind him but specified that Nobles never actually turned toward the police. *Id*. at pp. 126-133.

In addition to the witness testimonies, the jury heard from Defendants' ballistics expert, Greg Karim, who testified that a handgun recovered near Nobles' body matched a shell-casing found in front of Mooseknuckle Pub and a shell-casing located on the right side of Trinity Street, under Egal's bicycle. Tr. Vol. 4 at pp. 213-227.

The evidence presented at trial definitively showed that Defendants Egal and Johnson fired a total of five shots, three of which struck Nobles in the back and ultimately resulted in his death.

After Nobles was shot, the officers handcuffed Nobles on the ground, secured the area, and performed life-saving measures at the scene until EMTs arrived to take over. Nobles was pronounced dead at approximately 3:08 a.m. on May 7, 2017. In all, only a few minutes elapsed between the officers first seeing Nobles at the intersection of Sixth and Trinity Streets and Nobles being shot.

## II.   PROCEDURAL HISTORY

On April 5, 2019, Nobles' mother, Ida Renae Nobles, and his young children, K.N. and L.N., through their respective guardians ("Plaintiffs"), brought suit against the City of Austin, Sergeant Richard Egal, and Corporal Maxwell Johnson alleging violations of Landon Nobles' Fourth Amendment right to be free from the use of excessive force. Dkt. #1. On July 15, 2021, Plaintiffs voluntarily dismissed the City of Austin from this lawsuit. *See* Dkt. #35; Dkt #36. Defendants did not file any summary judgment motions before trial.

Following a six-day trial, the jury rendered a verdict in favor of Plaintiffs on December 15, 2021. Dkt. #70. Specifically, the jury found that Defendant Egal and Defendant Johnson each "violated Landon Nobles' Fourth Amendment right to be protected from excessive force by using excessive force during the course of Nobles' shooting." Dkt. #70. The jury further found that both Defendant Egal's and Defendant Johnson's actions during the shooting of Nobles were "objectively unreasonable in light of the clearly established law at the time, such that no reasonable officer could have believed that the shooting was lawful." *Id*.

The jury's verdict awarded the following damages:

- To Plaintiffs jointly:
    - $3.67 million for the physical pain and mental anguish experienced by Landon Nobles;
    - $187,500 against Defendant Richard Egal as exemplary damages;
    - $150,000 against Defendant Maxwell Johnson as exemplary damages;

- To Nobles' mother, Ida Renae Nobles:
  - o $2 million for past loss of companionship and society;
  - o $4.3 million for future loss of companionship and society;
  - o $3.5 million for past mental anguish;
  - o $7 million for future mental anguish;

- To Kadeidra Bell, as Next Friend of Nobles' child K.N.:
  - o $500,000 for past loss of companionship and society;
  - o $11.2 million for future loss of companionship and society;
  - o $250,000 for past mental anguish;
  - o $11.2 million for future mental anguish;

- To Michelle Dashaun Smith, as Next Friend of Nobles' child L.N.:
  - o $500,000 for past loss of companionship and society;
  - o $11.2 million for future loss of companionship and society;
  - o $250,000 for past mental anguish;
  - o $11.2 million for future mental anguish.

Dkt. #70. The jury award totaled $67,107,500.

On February 4, 2022, Defendants filed the instant Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial and Motion for Remittitur ("Defendants' Motion"). Dkt. #86. Plaintiffs filed a Response (Dkt. #93), and Defendants filed a Reply (Dkt. #95). On March 8, 2022, the court held a hearing on Defendants' Motion and ordered the parties to mediation. *See* Dkt. #97; Dkt. #98.

On April 29, 2022, the parties submitted a Joint Advisory informing the court that they could not resolve their disputes at mediation. Dkt. #100. On June 1, 2022, the court held a second in-person hearing on Defendants' Motion. Dkt. #104.

## III.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.   Legal Standard

Judgment as a matter of law is appropriate only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue." FED. R. CIV. P. 50(a). A motion for judgment as a matter of law is thus "a challenge to the legal sufficiency of

the evidence supporting the jury's verdict." *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000).

Courts "accord great deference to the jury's verdict when evaluating the sufficiency of the evidence." *Thomas v. Texas Dep't of Crim. Justice*, 220 F.3d 389, 392 (5th Cir. 2000). The court "must examine the evidence as a whole," *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019), and "draw all reasonable inferences in the light most favorable to the verdict," *Allstate Ins. v. Receivable Fin. Co.*, 501 F.3d 398, 405 (5th Cir. 2007). In doing so, the court must "credit[ ] the non-moving party's evidence and disregard[ ] all evidence favorable to the moving party that the jury is not required to believe." *Apache Deepwater, LLC v. W&T Offshore, Inc.*, 930 F.3d 647, 653 (5th Cir. 2019). It "may not make credibility determinations or weigh the evidence, as those are jury functions." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016).

The Fifth Circuit has counseled that "judgment as a matter of law should not be granted unless the facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (quoting *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1322 (5th Cir. 1994)).

**B. Analysis**

Defendants first renew their motion for judgment as a matter of law, arguing that there is no evidence to support the jury's verdict in favor of Plaintiffs on their excessive force claims, that no reasonable jury would find against Defendants on qualified immunity, and that there is no evidence to support the court's punitive damages instruction to the jury.

*i. Excessive Force*

The Fourth Amendment confers a right to be free from excessive force during an arrest. *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam). To establish a claim of

excessive force under the Fourth Amendment, a plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) (citation and internal quotation marks omitted).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Guiding this inquiry, the Supreme Court has identified three sets of facts which deserve careful consideration in determining whether the force used is "excessive" or "unreasonable": (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *see also Griggs v. Brewer*, 841 F.3d 308, 313-14 (5th Cir. 2016) ("A court must measure the force used under the facts as a reasonable person would perceive them, not necessarily against the historical facts.").

Viewing the evidence in the light most favorable to Plaintiffs and disregarding all evidence favorable to the moving party that the jury is not required to believe, the court cannot conclude that the evidence is "so strongly and overwhelmingly in [Defendants'] favor that reasonable jurors could not reach a contrary conclusion," as to Plaintiffs' excessive force claims. *Flowers*, 247 F.3d at 235.

First, it is undisputed that Nobles sustained an injury—he was shot and killed by Defendants. Second, it is also undisputed that Nobles' death resulted directly and only from the force applied by Egal and Johnson. Whether Defendants' use of force was excessive to the need came down to two very different versions of events.

8

As discussed above, Defendants' position at trial was that Nobles had a firearm in his hand while running from them. Defendants relied on testimony from Egal and Johnson that Nobles at some point during the chase, began to turn toward the officers pursuing him with a gun in hand, and testimony that Nobles fired a weapon during the chase. In addition to Johnson's and Egal's testimony, Defendants also presented testimony from other officers that stated Nobles had a gun in hand and discharged the weapon. Defendants maintained that Egal and Johnson fired their weapons at Nobles only after perceiving some combination of Nobles turning and pointing the firearm in their direction. Plaintiffs, on the other hand, contended that Nobles was simply running away and was not a threat to the officers. Plaintiffs relied on the testimony of citizen witnesses, such as the sound technician, Nobles' cousin, and the security guards, who testified that Nobles did not have a gun in hand, and never pointed any weapon during the pursuit.[2] Plaintiffs also emphasized that Nobles was shot three times in the back. The jury was presented with evidence showing that entrance wounds for all three shots were either in Nobles' back or buttocks. Plaintiffs argued that the location of the entrance wounds was inconsistent with Nobles turning towards the officers.

Plaintiffs submitted evidence sufficient for a reasonable jury to agree with their version of events. This included several eyewitnesses that testified that they never saw Nobles holding a firearm or aiming a firearm at officers. In addition to the evidence supporting their version of events, Plaintiffs presented evidence that undermined Defendants' version of events. While never conceding possession of the firearm that was subsequently discovered near Nobles' body, Plaintiffs did argue that the physical evidence did not support the officers' testimony. For example, a shell-casing was found under Egal's bike on the right-side of Trinity Street. Like the shell-casing

---

[2] Plaintiffs' Counsel also noted that the weapon recovered near Nobles' body was never definitively linked to Nobles, arguing there was insufficient proof to establish it was Nobles' gun and insinuating that it may have been planted.

discovered in front of the Mooseknuckle Pub, this shell-casing matched the firearm discovered near Nobles' body. However, the jury heard testimony from the ballistics expert that the firearm ejects shell-casings to the right. The discovery of the shell-casing under Egal's bicycle on the right side of the street was consistent with the firearm having been discharged while pointing northbound, or up, Trinity Street. The shell-casing's location was arguably inconsistent with the officers' testimony that Nobles turned in a southbound direction, towards the officers, when the firearm was discharged.

With respect to the *Graham* factors, the jury heard testimony that Nobles was suspected of the crime of firing a weapon into the air in front of a bar on Sixth Street, a misdemeanor crime which, although not intended to hurt anyone, can be dangerous. The evidence also showed that Nobles actively fled from the officers when they began to approach him. However, as discussed above, the jury heard conflicting evidence on whether Nobles posed an immediate threat to the safety of the officers or others. The ultimate conclusion of which version of the facts to believe in such a case must be left to the jury, which is responsible for making credibility determinations. *See Reeves*, 530 U.S. at 150; *Ostrander v. Kosteck*, 2017 WL 4414263, at *4 (W.D. Tex. Oct. 4, 2017). Viewing the evidence in the light most favorable to Plaintiffs and disregarding all evidence favorable to the moving party that the jury is not required to believe, the court finds there is sufficient evidence to support the jury's conclusion that the force used by Defendants was excessive or unreasonable. *See Faulkenberry v. Yost*, 2018 WL 297615 (W.D. Tex. Jan. 3, 2018). Consequently, viewed in the light most favorable to Plaintiffs, the court is unable to conclude there was a lack of substantial evidence to support the jury's verdict in favor of Plaintiffs on their excessive force claims.[3]

---

[3] The court notes that an alternative outcome on the excessive force question could have just as easily been supported by the evidence presented at trial. Importantly, at the time the jury made its decision it had the benefit of having witnessed the actual testimony at trial. Though another jury might have weighed the evidence differently or might

ii.    *Qualified Immunity*

Defendants also assert they are entitled to judgment as a matter of law because no reasonable jury could find that they were not entitled to qualified immunity. "Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (internal quotation marks omitted). To overcome a qualified immunity defense, a plaintiff must show that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A district court has discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

At trial, Plaintiffs and Defendants presented two different versions of events to the jury, and as discussed above, Plaintiffs submitted sufficient evidence for a reasonable jury to agree with their version of events. As to the first step of the qualified immunity analysis, because the court concludes there was enough evidence for the jury to accept Plaintiffs' version of events based on the jury's credibility determinations, it also concludes that the evidence was sufficient to show Defendants violated Nobles' constitutional rights. *See Morris*, 449 F.3d at 684.

The court next turns to whether Nobles' constitutional rights were "clearly established" at the time of the challenged conduct. *See Harlow*, 457 U.S. at 818. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al–Kidd*, 563 U.S. 731 (2011) (alterations in original)

---

have made different credibility assessments, all that matters for resolving this motion is that the record contains some evidence on which this jury could have relied in reaching its verdict. Because the record is not devoid of evidence to uphold this jury's verdict, the verdict must stand. *Long v. Faenas Transp., LLC,* 2021 WL 1379513, at *6 (E.D. Tex. Mar. 19, 2021), *aff'd sub nom. Long v. Faenas Transp., LLC*, 2021 WL 5119717 (5th Cir. Nov. 3, 2021).

(quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court "does not require a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted).

The court therefore analyzes whether, in May 2017, a reasonable government official would have known that Defendants' actions violated Nobles' rights. In their Motion, Defendants point to several cases in which the Fifth Circuit found officers entitled to qualified immunity based on the fact a suspect was armed, or believed to be armed, to argue that Defendants' actions in this case fall within the objective reasonable standard. *See* Dkt. #86 at 6-9 (citing *Garza v. Briones*, 943 F.3d 740, 748 (5th Cir. 2019); *Valderas v. City of Lubbock*, 937 F.3d 384 (5th Cir. 2019); *Hudspeth v. City of Shreveport*, 270 Fed. App'x. 332, 337 (5th Cir. 2008)). Defendants emphasize Johnson's and Egal's belief that Nobles had a gun while fleeing on a crowded street and the rapid nature of the incident to support their argument that Defendants did not violate clearly established law by firing on Nobles. Dkt. #86 at 9. Defendants further argue that the fact that some of the other officers had conflicting narratives does not preclude a finding of qualified immunity, as differing perspectives are to be expected in "the heat of a perilous and rapidly evolving situation." *See Garza,* 943 F.3d at 748.

Plaintiffs respond that despite Defendants' arguments post-trial, the jury heard the competing evidence at trial, explicitly considered the question of qualified immunity, and ultimately concluded in its jury verdict that Plaintiffs proved Defendants' actions were objectively unreasonable given the facts and circumstances at the time and that Defendants therefore were not entitled to qualified immunity. *See* Dkt. # 70 at 2-3 (Jury Verdict Form). Plaintiffs further highlight that Defendants did not file any pre-trial motions to dismiss or motions for summary judgment on

the basis of qualified immunity, instead posing the question to the jury in the jury charge. Dkt. #90 at 4.

At trial, Plaintiffs presented evidence that other officers also in pursuit of Nobles did not see a gun or hear any gunshots until Egal and Johnson fired their weapons. Plaintiffs further elicited testimony from the other responding officers that those officers did not have their weapons drawn, or instead drew tasers. Plaintiffs also elicited competing testimony from citizen witnesses that did not see any weapon in Nobles' hand. In response to Defendants' Motion, Plaintiffs highlight these facts and assert that they presented adequate evidence at trial to support the jury's finding in their favor on the issue of qualified immunity. Dkt. #90 at 3.

The court acknowledges that Defendants' post-trial motion presents compelling arguments in their favor. However, although some evidence could support a contrary conclusion, the court finds that the jury's verdict on qualified immunity is not against the great weight of the evidence such that the verdict will result in a miscarriage of justice. *See Kie v. Williams*, 697 F. App'x 388, 390 (5th Cir. 2017) (per curiam). Though another jury might have weighed the evidence differently, all that matters for resolving this motion is that the record contains some evidence on which this jury could have relied in reaching its verdict. Accordingly, Defendants have not made "a clear showing of an absolute absence of evidence to support the jury's verdict." *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265, 269 (5th Cir. 1998); *see also, e.g. Stanton v. Jarvis Christian Coll.*, 477 F. Supp. 3d 561, 573 (E.D. Tex. Aug. 6, 2020), *aff'd*, 2022 WL 738617 (5th Cir. Mar. 11, 2022).

iii.    *Punitive Damages Instruction*

Defendants also challenge the court's jury instructions,[4] asserting that there was "no evidence from which a reasonable jury could find the necessary level of evil intent or recklessness necessary to support the punitive damages claim."  Dkt. #86 at 10.  Defendants' Motion thus requests the court enter judgment in Defendants' favor on the punitive damages claims and dismiss those claims with prejudice.  *Id*. at 11.

In objecting to the punitive damage instruction, Defendants argue that Plaintiffs failed to submit any evidence of malicious intent or recklessness. The court disagrees. The jury's verdict on Plaintiffs' excessive force claims against Egal and Johnson permitted the jury to impose punitive damages. *See Jones v. Conner*, 233 F.3d 574 (5th Cir. 2000) (per curiam). Since this court has already concluded that the evidence was sufficient as a matter of law to support the jury's findings of excessive-force liability, it follows that the jury had the discretion to award punitive damages. *Smith v. Wade*, 461 U.S. 30, 51-52 (1983); *Ostrander v. Kosteck*, 2017 WL 4414263, at *10 (W.D. Tex. Oct. 4, 2017). Accordingly, the court denies Defendants' motion for judgment as a matter of law as to the punitive damages claims.

**IV.    MOTION FOR NEW TRIAL**

**A. Legal Standard**

Rule 50 also provides that a party "may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b); *Long v. Shultz Cattle Co*., 881 F.2d 129, 132 (5th Cir. 1989) (An alternative motion for a new trial "may be granted even if the moving party is not entitled to judgment as a matter of law."). Rule 59(a) provides that a court may grant a new trial

---

[4] Defendants first raised an objection to the inclusion of the punitive damages instruction on the basis of insufficient evidence at the final charge conference, and reasserted their objection before the jury began to deliberate (Tr. Vol. 6 at p. 87), thus Defendants have preserved their objection.  *See Best v. Johnson*, 714 F. App'x 404, 408-09 (5th Cir. 2018).

"for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Though undefined by the Rule, a district court may grant a new trial if, for example, it finds that "the verdict was against the weight of the evidence," or "the damages awarded were excessive." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784 (5th Cir. 2018) (brackets, internal quotes, and citation omitted). "A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 497 (5th Cir. 2002).

The decision to grant or deny a motion for a new trial, including the determination of whether a verdict is against the great weight of the evidence, is a question committed to the court's sound discretion. *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 230 (5th Cir. 2020); *Foradori v. Harris*, 523 F.3d 477, 503-04 (5th Cir. 2008). This discretion is even broader when the court denies, rather than grants, such a motion. *Compare Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) ("Where a motion for a new trial is granted, we scrutinize that decision more closely," because "the broad discretion allowed to the trial court is tempered by the deference due to a jury" (internal quotes and citation omitted)), *with Whitehead*, 163 F.3d at 269 ("It goes without saying that review of the denial of a new trial motion is more limited than when one is granted. The denial will be affirmed unless, on appeal, the party that was the movant in district court makes a clear showing of an absolute absence of evidence to support the jury's verdict, thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict contrary to the great weight of the evidence.") (internal quotes and citation omitted)).

### B. Analysis

Defendants' Motion alternatively seeks a new trial under Rule 59. Dkt. #86. Defendants offer a plethora of arguments in moving for a new trial, the majority of which have already been

addressed and rejected by the court at the March 8, 2022 and June 1, 2022 hearings. Defendants'

chief arguments are as follows. Defendants assert that the court erred in denying their attempted

peremptory strike of a juror on *Batson* grounds and in allowing impeachment testimony of

Defendants' firearms expert Dkt. #86 at 26. Defendants further assert that a new trial is warranted

based on certain prejudicial and inflammatory remarks made by Plaintiffs' Counsel during trial.

*Id*. at 11-18. The majority of Defendants' briefing, however, is dedicated to its arguments that the

jury's findings that the Defendants used excessive force and its findings in favor of Plaintiffs on

qualified immunity were against the great weight of the evidence. *Id*. at 3-10. Defendants

additionally argue that the jury's damages awards are clearly excessive and unjust, demonstrating

it was the improper result of emotion and passion, thus necessitating a new trial.  *Id*. at 19-25. The

court addresses Defendants' arguments in turn.

### A.  *Batson* Challenge

Defendants' Motion asserts that the court erred by sustaining Plaintiffs' *Batson* challenge

to their attempted peremptory strike of a juror. Dkt. #86 at 27-29. In *Batson v. Kentucky*, the

Supreme Court outlined a three-step process for determining whether preemptory strikes have been

applied in a discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79 (1986). First, the claimant

must make a prima facie showing that the peremptory challenges have been exercised on the basis

of race. Second, if this requisite showing has been made, the burden shifts to the party accused of

discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the

trial court must determine whether the claimant has carried his burden of proving purposeful

discrimination. *See Batson*, 476 U.S. at 93-98. "On appeal, a trial court's ruling on the issue of

discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552

U.S. 472, 477 (2008); *see United States v. Kennedy*, 707 F.3d 558, 568 (5th Cir. 2013) (*Batson*

rulings reviewed for "clear error"). The Fifth Circuit has held that it "must give great deference to

the district court because findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the [peremptory] challenge." *Kennedy*, 707 F.3d at 568.

At the end of jury selection, Plaintiffs raised a *Batson* challenge to the Defendants' attempted peremptory strike of the only African American on the jury panel. Tr. Vol. 1 at pp. 105-106. Upon inquiry by the court, Defendants' Counsel argued that they sought to strike the juror because he had previously been arrested for a misdemeanor possession of marijuana and because he worked in security, and Defendants planned to call two security guards as witnesses with some conflicting testimony. After considering the proffered race-neutral reasons for striking the sole black juror, the court found Defendants' Counsel's explanations to be unconvincing and sustained Plaintiffs' *Batson* challenge. Tr. Vol. 1 at pp. 105-106. Defendants now assert that because Plaintiffs had the burden of demonstrating Defendants' race-neutral explanations were pretextual, the court erred in sustaining the *Batson* challenge. Dkt. #86 at 28. However, as the Fifth Circuit has explained, "[i]n a typical peremptory challenge inquiry, the decisive question will normally be whether a proffered race-neutral explanation should be believed. There will seldom be any evidence that the claimant can introduce—beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities." *United States v. Bentley-Smith*, 2 F.3d 1368, 1373-74 (5th Cir. 1993).

Here, the court listened to Defendants' Counsel's proffered explanations and reached a decision that their explanations for the peremptory strike were pretextual and that the attempted strike was based on race. The juror in question was a 39-year-old African American man who wore a coat and tie during voir dire and every day thereafter during trial. He answered all questions respectfully and directly. He did not attempt to misdirect, mislead or avoid answering any questions asked. Despite having provided the attorneys an opportunity to question the panel, no effort was made by Defendants' Counsel to distinguish the juror in question from any other

members of the panel during questioning. Defendants' justification for their exercise of their peremptory strike was belied during the eventual trial. Two men working security on Sixth Street testified during the trial. Like the juror, both men were African American. The first of the two testifying security guards testified he neither heard a shot nor saw Nobles with a firearm in his hand. Yet the second testifying security guard was actually a supervisor and testified in a manner somewhat consistent with the Defendants' version of events. The supervisor security guard testified that while he did not see a gun in Nobles' hand, he did hear a gunshot that preceded the officers' discharge of their weapons. Simply put, the Defendants' proffered basis for the exercise of their peremptory strike was unpersuasive.

### B.  Impeachment of Defendants' Expert

Defendants argue the court further erred in allowing impeachment testimony concerning their firearms expert. Dkt. #86 at 26. At trial, Plaintiffs sought to question Defendants' firearms expert, Greg Karim, regarding a prior disciplinary proceeding involving alleged dishonesty in a personnel matter. Tr. Vol. 4 at p. 265. Out of the presence of the jury, the court determined that in-depth questioning and extrinsic evidence of the disciplinary matter and personnel issue was inadmissible under FED. R. EVID. 403. Over Defendants' objection, the court allowed Plaintiffs to ask Karim a single question regarding his alleged prior dishonesty: "Now isn't it true, Mr. Karim, that you resigned from your duties in the Austin Police Department, and you resigned in lieu of discharge for being dishonest in relation to a personnel matter?" *Id.*

In their Motion, Defendants assert that the court erred in admitting this limited impeachment of Karim, arguing that the testimony had no relevance to Karim's conduct as an expert in the instant matter or his trial testimony. Dkt. #86 at 26. As stated at the March 8, 2022 hearing, the court significantly restricted Plaintiffs' impeachment of Karim on this issue, limiting Plaintiffs to a single question that made clear that the alleged dishonesty against Karim was not

connected to his work as an expert in this case but to an unrelated personnel incident while employed by Austin Police Department. The court rejects Defendants' argument that a new trial is warranted based on this limited testimony.

### C.  Remarks by Plaintiffs' Counsel

Defendants also assert that a new trial is warranted based on Plaintiffs' Counsel's "blatantly prejudicial and inflammatory remarks during opening statement and closing argument." Dkt. #86 at 11. Defendants point to Plaintiffs' Counsel's statements referencing the George Floyd incident and community conscience,[5] appeals to emotion and passion,[6] and references to the City of Austin defending and indemnifying the Officers.[7] *Id*. at 13-16, 18.

"Courts usually permit reasonable latitude in counsel's final arguments to the jury." *Edwards v. Sears, Roebuck & Co*., 512 F.2d 276, 283 (5th Cir. 1975). "No doubt, final arguments must be forceful." *Whitehead v. Food Max of Mississippi, Inc*., 163 F.3d 265, 276 (5th Cir. 1998), "Proficiency in jury argument, an ability to sway doubtful minds, a method of convincing others of the rightness of one's positions are important not only to successful advocacy but also to effective representation of the client's interests." *Edwards*, 512 F.2d at 283. "But advocacy is circumscribed both by an attorney's own professional responsibility and the court's obligation to provide the parties a fair trial." *Id*. "Obviously, awards influenced by passion and prejudice are the antithesis of a fair trial." *Whitehead*, 163 F.3d at 276. "When a final argument is challenged for

---

[5] "Let's take, for instance, George Floyd. Were it not for a bystander, they would have gotten away with that. We have a similar situation here."  (Tr. Vol. 6 at p. 107).

[6] For example, "His kinfolk that were down there with him for the birthday celebration that they were going to participate in, they watched him die. They didn't even get a chance to hold him while he died or console him while he was in his pain. He bled out like a dog on the street. They didn't get to say goodbye to him." (Tr. Vol. 1, at p. 132); and "he laid there looking at the police officers asking them, 'Why did you shoot me? Stop shooting me.'" (Tr. Vol. 6, at p. 140).

[7] "Mr. Laird is a lawyer for the City, and it's the City of Austin who's defending the cops in this action." (Tr., Vol. 6, at p. 111); "And it's hard to sit in judgment of nice guys, but you're not sitting in judgment where they're going to lose their jobs or they're going to prison. You're sitting in judgment on whether or not the City is going to pay out for their mistakes when they were their agents." (Tr. Vol. 6, at p. 123).

impropriety or error," a court must review the entire argument "within the context of the court's rulings on objection, the jury charge, and any corrective measures applied by the trial court." *Id.* at 275-76.

As an initial matter, Defendants failed to object during trial to nearly all of the remarks they now complain of. Failure to object during trial results in waiver. *See Edwards v. Sears, Roebuck and Co*., 512 F.2d 276, 283 (5th Cir. 1975)); *see also, e.g., Baisden v. I'm Ready Prods., Inc*., 693 F.3d 491, 509 (5th Cir. 2012) (movant waived objection to statements in closing argument because he "raised no objection to the statements at trial"). In the event of waiver, a court may grant a new trial only if the closing argument "'affect[s] the substantial rights of the parties'" by, for example, "seriously prejudic[ing] [the movant's] right to a fair trial." *Edwards*, 512 F.2d at 286 (quoting FED. R. CIV. P. 61); *see also Liner v. J.B. Talley and Co., Inc*., 618 F.2d, 327, 329-330 (5th Cir. 1980) (expressing "extreme reluctance to grant relief in the absence of an objection"). Here, Defendants did not object to all but one of the remarks they now challenge, as such Defendants must prove those statements "rise to the level of severity that would require a new trial to avoid a miscarriage of justice." *Baisden*, 693 F.3d at 509 n.17. Having reviewed the record as a whole, the court concludes Defendants have not shown that the remarks affected their substantial right to a fair trial in totality. *See id.; see also Stanton v. Jarvis Christian Coll*., 477 F. Supp. 3d 561, 574 (E.D. Tex. Aug, 6, 2020), *aff'd*, 2022 WL 738617 (5th Cir. Mar. 11, 2022).

The court notes that Defendants did raise an objection to the arguably most objectionable statement , in which Plaintiffs' Counsel stated, "[t]his was a terrible experience and it did not have to be. You must make the City pay for that; otherwise, we're going to go into the future with more George Floyd style incidents, more Landon Nobles style incidents . . ." Tr. Vol. 6, at pp. 141-142. The court sustained that objection and gave a curative instruction. *Id*. at pp. 142-143. The Fifth Circuit has held that "[a] new trial is required only when, after a review of the entire record, it

appears that there is a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict. We give great weight to the trial court's assessment of the prejudicial effect of the evidence, and prejudice may be rendered harmless by a curative instruction." *United States v. Valles*, 484 F.3d 745, 756 (5th Cir. 2007). Defendants here have not shown how the court's instructions were insufficient to cure any concerns about the remark.

While the court agrees that Plaintiffs' Counsel made several statements that skirt the line of appropriateness, upon review of the statements in context, the record as a whole, and the relevant case law, the court concludes that Defendants have not met their burden to establish that a new trial is warranted on this basis. *See Whitehead*, 163 F.3d at 276.

### D. Damages Excessive

Lastly, Defendants contend that the jury's verdict on damages was "excessive, unjust, and not supported by the evidence," thus indicating the award resulted from passion or prejudice and warranting a new trial as a matter of law. Dkt. #86 at 19-25. While Defendants are correct a new trial is warranted where a damage award is motivated by passion or prejudice, *see, e.g., Consol. Cos., Inc. v. Lexington Ins. Co.*, 616 F.3d 422, 435 (5th Cir. 2010), the court rejects Defendants' claim the jury was necessarily so motivated here. It is just as likely the jury's excessive award included an impermissible valuation of the deprivation of Nobles' constitutional rights or was a consequence of Defendants' failure to provide its own damages valuation to the jury in the event of a loss on liability. *See Chacon v. Copeland*, 103 F. Supp. 3d 827, 834-35 (W.D. Tex. April 30, 2015).

The Fifth Circuit has "firmly established in previous cases that it will not reverse a jury verdict for excessiveness except on "the strongest of showings." *Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008). The size of the award a plaintiff is entitled to is generally a question of fact, and the reviewing court "should be 'exceedingly hesitant' to overturn the decision of the jury—

the primary fact finder—and the trial judge who concurred with its verdict." *Id*. Thus, the Fifth Circuit has explained, "we have upheld the denial of a new trial on the question of damages even when we have disagreed with the award, and we will reverse an award as excessive only when it "clearly exceeds that amount that any reasonable man could feel the claimant is entitled to." *Id*. (internal citations omitted). Accordingly, Defendants' motion for a new trial based on the damages award is denied. *See Foradori*, 523 F.3d at 504*; see also Caldarera v. E. Airlines, Inc*., 705 F.2d 778, 784 (5th Cir. 1983)

In the alternative to ordering a new trial, Defendants request the court remit the damages awarded by the jury to a reasonable damages award. Dkt. #86 at 29. As indicated at the hearing, and as discussed in detail below, the court agrees that a remittitur is necessary in this case.

## V.   REMITTITUR

### A.  Legal Standard

A court may order a remittitur where the jury's damages award "is entirely disproportionate to the injury sustained." *Caldarera*, 705 F.2d at 784. An award is "entirely disproportionate" when it is "so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive," or one which "clearly exceed[s] that amount that any reasonable man could feel the claimant is entitled to." *Id*. (internal citations and quotation marks omitted). A verdict is excessive as a matter of law if it exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Brunnemann v. Terra Int'l, Inc*., 975 F.2d 175, 178 (5th Cir. 1992) (internal quotation marks omitted). "It is a basic concept of damages that they must be proved by the party seeking them." *Servicios–Expoarma, C.A. v. Indus. Mar. Carriers, Inc*., 135 F.3d 984, 995 (5th Cir. 1998).

22

Where a damages award is excessive, the court "may either order a new trial on damages or may give the plaintiff the option of avoiding a new trial by agreeing to a remittitur of the excessive portion of the award." *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) (citing *Osburn v. Anchor Labs, Inc*., 825 F.2d 908, 919 (5th Cir. 1987)). Fifth Circuit law dictates that the size of the remittitur is determined in accord with the "maximum recovery rule," under which the verdict must be reduced to the maximum amount the jury could properly have awarded. *See Naquin v. Elevating Boats, LLC*, 744 F.3d 927, 940 n.67 (5th Cir. 2014) ("Under this circuit's 'maximum recovery rule,' we will uphold a jury award if there is a damage award in at least one 'factually similar case from the relevant jurisdiction' that, when increased by 50%, equals or exceeds the challenged jury award." (quoting *Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003)). Importantly, while "factually similar cases 'provide an objective frame of reference, . . . they do not control our assessment of individual circumstances.'" *Dulin v. Bd. of Comm'rs of Greenwood Leflore Hosp*., 586 F. App'x 643, 650 (5th Cir. 2014). Further, when a "review of the caselaw reveals that there is no factually similar case in the relevant jurisdiction[,] the maximum recovery rule is not implicated." *Foradori*, 523 F.3d at 505. "'Of course, [the court's] reassessment of the damages cannot be supported entirely by rational analysis, but involves an inherently subjective component.'" *Giles v. Gen. Elec. Co*., 245 F.3d 474, 489 (5th Cir. 2001) (quoting *Eiland v. Westinghouse Elec. Corp*., 58 F.3d 176, 183 (5th Cir. 1995)); *see also Puga v. RCX Sols., Inc*., 922 F.3d 285, 297 (5th Cir. 2019).

## B. Analysis

As previously noted, the jury awarded a total of $67,107,500 in damages to Plaintiffs: $3,670,000 for Landon Nobles' physical pain and mental anguish prior to his death; $6,300,000 to Nobles' mother, Ida Renae Nobles, for her past and future loss of companionship and society; $10,500,000 for Ida Renae Nobles' past and future mental anguish; and identical awards of

$23,150,000 to each of Nobles' minor sons, K.N. and L.N., for their past and future loss of companionship and past and future mental anguish. *See* Dkt. #70. The jury also assessed punitive damages awards of $187,500 and $150,000 against Defendant Egal and Defendant Johnson, respectively. *Id.*

At the March 8, 2022 hearing on the instant Motion, the court expressly communicated to the parties its conclusion that the jury's award was clearly excessive and that a remittitur would be necessary. *See* Dkt. #97. As such, the court ordered the parties to mediation, with a focus on negotiating an appropriate reduction in damages. Dkt. #98. In an attempt to aid the mediation, the court further instructed the parties to each draft a memorandum on the issue of remittitur and to compile the best cases in support their positions. *Id.*; *see also* Dkt. #101; Dkt. #102. After the mediation was unsuccessful, at the June 1, 2022 hearing, the parties were further given the opportunity to present further arguments in support of their respective remittitur positions. Dkt. #104.

The court has made a review of all the cases submitted by the parties related to remittitur. The court has also conducted its own comprehensive research and has been unable to find any cases directly on point with the instant matter. No reported case is wholly similar to the facts of this case, thus the maximum recovery rule is not mandated here. *See Foradori*, 523 F.3d at 505. However, due to the size of the verdict in this case the court is of the opinion that a remittitur analysis is appropriate. *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002) (explaining, "Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw.'"). With this backdrop, the court remits portions of the jury's award as described below.

     *i.*      *Landon Nobles' Physical Pain and Mental Anguish*

Defendants first contend that the jury's award of $3,600,000 for the physical pain and mental anguish experienced by Landon Nobles prior to his death is excessive and unsupported by the evidence. Dkt. #86 at 21–22.

Texas law provides that damages for pain and suffering are recoverable only if the person was aware or conscious after the accident. *See Southern Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex. App.—Corpus Christi 1987, no writ) ("In Texas, only pain consciously suffered and experienced is compensable.")(citing *Burrous v. Knotts*, 482 S.W.2d 358 (Tex. Civ. App.—Tyler 1972, no writ)); *Levinge Corp. v. Ledezma*, 752 S.W.2d 641, 645 (Tex. App.—Houston [1st Dist.] 1988, no writ) ("Damages for pain and suffering during unconsciousness are not allowable."); *see also Guzman v. Guajardo*, 761 S.W.2d 506, 512 (Tex. App.—Corpus Christi 1988, writ denied) ($600,000 award upheld where decedent "consciously felt severe pain for at least fifteen minutes after being struck"); *Missouri Pac. R.R. v. Lane*, 720 S.W.2d 830, 833 (Tex. App.—Texarkana 1986, no writ) ($19,500 award upheld for pain and suffering due to terror and anguish decedent suffered for six to eight seconds); *Gulf States Util. Co. v. Reed*, 659 S.W.2d 849, 855 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.); *Ruiz v. Guerra*, 293 S.W.3d 706, 722 (Tex. App.—San Antonio 2009, no pet.) (conscious pain and suffering may be inferred from proof that the deceased had severe injuries or may be established by circumstantial evidence).

When the existence of pain and suffering is established, "there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the discretion of the fact-finder." *Dawson*, 107 S.W.3d at 751. The amount of damages awarded for pain and suffering are "necessarily speculative and each case must be judged on its own facts." *Pentes Design Inc. v. Perez*, 840 S.W.2d 75, 80–81 (Tex. App.—Corpus Christi 1992, writ denied). Further, mental anguish is also recoverable for injuries of such a "shocking and disturbing nature

that mental anguish is a highly foreseeable result," including suits for wrongful death. *Id*. Where the plaintiff himself has been seriously injured, mental anguish may be inferred by the fact finder. *Popkowsi v. Gramza*, 671 S.W.2d 915, 919 (Tex. App.—Houston [1st Dist.] 1984, no writ); *see also City of Tyler*, 962 S.W.2d at 495.

Here, it is undisputed that Nobles was shot three times and died as a result. Thus it is clear that Nobles suffered physical pain and mental anguish. However, Defendants' Motion notes that no evidence was presented at trial regarding how long Nobles survived after the shooting. While the jury heard testimony that after Nobles was shot and fell to the ground, Nobles was able to raise his hands up to comply with Egal's order to show his hands (Tr. Vol. 6 at p. 30), by the time officers began performing CPR on Nobles, "within a minute or two, if not faster," after the shooting, Nobles had lost consciousness (Tr. Vol. 3 at p. 196). No evidence was presented indicating whether or not Nobles ever regained consciousness. The record reflects Nobles died on scene at 3:07 a.m. on May 17, 2017.

"The duration of the pain and mental anguish is an important consideration." *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). Further, a damages award for pre-death mental anguish cannot stand when the only evidence to support it is speculative or purely conjectural. *See Vogler v. Blackmore*, 352 F.3d 150, 160 (5th Cir. 2003) (award of $200,000 to estate of deceased for pain and suffering and mental anguish prior to death excessive). Here, the jury heard minimal evidence regarding Nobles' physical pain and mental anguish prior to his death. It is clear that the evidence cannot support the jury's $3,600,000 damages award. The court therefore finds an award greater than $1,000,000 would be excessive and remits the jury's award accordingly.

*ii.*     *Ida Renae Nobles' Awards for Loss of Companionship and Society and Mental Anguish*

Defendants object to the jury's awards of $6,300,000 for Ida Renae Nobles' past and future loss of companionship and society and $10,500,000 for her past and future mental anguish.

In wrongful death cases, mental anguish damages and loss of companionship and society damages both compensate for noneconomic losses. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). However, these two elements of damages are separate and do not overlap. *Id.*; *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Mental anguish is the emotional pain, torment, and mental suffering that the plaintiff experienced as a result of the death of a family member. *Plasencia v. Burton*, 440 S.W.3d 139, 148 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Thomas*, 290 S.W.3d at 455. Damages for mental anguish are intended to compensate the beneficiary for the deleterious effect that the wrongful death had on the beneficiary. *Moore*, 722 S.W.2d at 688; *Thomas*, 290 S.W.3d at 455. To recover for mental anguish, a claimant must demonstrate a high degree of mental suffering beyond disappointment, anger, resentment, or embarrassment, although mental anguish may include all these emotions. *Thomas*, 290 S.W.3d at 455. Proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, despair, public humiliation, or a combination of any or all of those feelings. *Id.*

By contrast, damages for loss of companionship and society are intended to compensate the beneficiary for the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have received had the decedent lived. *Moore*, 722 S.W.2d at 687-88; *Thomas*, 290 S.W.3d at 455. Thus, while mental anguish emphasizes the negative impact that the wrongful death had on the beneficiary, loss of companionship and society focuses on the removal of positive benefits that the beneficiary once enjoyed but which were taken away by the wrongful death. *Moore*, 722 S.W.2d at 688. Although mental anguish is distinguishable from loss

27

of companionship and society, the jury may consider some of the same factors in awarding damages for both of the elements. Those factors include (1) the relationship between the decedent and the beneficiary, (2) the living arrangements of the parties, (3) any absence of the deceased from the beneficiary for extended periods, (4) the harmony of family relations, and (5) the parties' common interests and activities. *Id*.

Mental anguish and loss of companionship and society are "inherently somewhat imprecise." *Thomas*, 290 S.W.3d at 454. Because these damages are unliquidated and incapable of precise mathematical calculation, the jury is given significant discretion in fixing the amount of the award. *Id*. However, that discretion is limited. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

The evidence presented at trial in support of loss of companionship and society and mental anguish for Ida Renae Nobles is as follows: Ms. Nobles testified that she and Landon Nobles lived with her parents, and Landon Nobles would occasionally help out with household expenses. Tr. Vol. 3, at p. 88. She further stated that Landon Nobles also helped take out the trash and performed yard work. *Id*. at p. 87. Ms. Nobles explained that she is disabled, and after her surgeries she relied on Landon to help her. *Id*. Further, Ms. Nobles testified that since Landon's death, she has been prescribed sleeping pills and medication for depression. *Id*. at 86. Ms. Nobles also testified that she misses her son and that, because Landon was "the glue to the family," without Landon the family does not gather together as much at holidays. *Id*. at p. 85.

The court agrees that the forgoing testimony, while sympathetic, does not support the jury's award of $6,300,000 for Ms. Nobles' past and future loss of companionship and society nor its award of $10,500,000 for her past and future mental anguish. A comparison of other wrongful

death cases involving parental loss of a child confirms this conclusion.[8] For example, in *Frazier v. Honeywell*, 518 F.Supp.2d 831 (E.D. Tex. Oct. 3, 2007), the district court found the jury's award of $24,000,000 to the parents of a young woman killed by a drunk driver was excessive, and remitted the award to $4,875,000 to each parent for past and future loss of companionship and mental anguish, despite the fact the court's opinion described the father's testimony as being "as compelling and moving as any this judge has heard in over 30 years as a civil trial attorney and judge." *Id*.

In *Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420 (5th Cir. 1992), the Fifth Circuit upheld an award of $1,225,000 for mother's mental anguish and loss of companionship and society after her 14-year-old son was killed when he was pinned underneath an automatic garage door. However in affirming, the Circuit Court noted that the record established that the mother acted as the son's sole caretaker and she and her son were very close, and highlighted the fact that the mother also presented evidence that she required medication as the result of son's death, attended group therapy sessions, and missed time from work as the result of son's death. *Id*.

In *Gulf States Utilities Company v. Reed*, the court affirmed wrongful death damages of $500,000 for loss of society and $500,000 in mental anguish awarded to the mother of a thirteen-year-old boy who was electrocuted while retrieving a Frisbee from under a metal building. 659 S.W.2d 849, 852-53 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). In reviewing the sufficiency of the evidence, the *Reed* court noted that the decedent was the mother's only child and that he had a close affectionate relationship with her. *Id*. at 855. Further, the mother was hospitalized for five months after his death. *Id*. Her doctors subsequently diagnosed her with severe chronic depression attributable to her son's death and placed her on anti-depressants, which were

---

[8] Although neither party submitted any case citations to cases with similar underlying facts, namely incidents of officer-involved deaths or shootings, the court reviews awards "in the context of awards in cases with similar injuries in the relevant jurisdiction." *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003).

to be continued indefinitely. She also suffered severe weight loss and sleeping difficulties following her son's death. *Id*.

Although damages for mental anguish are not susceptible to an exact calculation or prediction, the evidence Plaintiffs presented at trial is insufficient to support the jury's awards of $6,300,000 for Ida Renae Nobles' past and future loss of companionship or its an award of $10,500,000 for her past and future mental anguish. The court therefore remits the jury's awards to $1,000,000 for Ida Renae Nobles' past and future loss of companionship and society; and $1,000,000 for Ida Renae Nobles' past and future mental anguish.

iii.     *K.N.'s and L.N.'s Awards for Loss of Companionship and Society and Mental Anguish*

Defendants also object to the jury's identical awards of $23,150,000 to Nobles' minor sons, K.N. and L.N., for their past and future loss of companionship and society and past and future mental anguish. Dkt. #86 at 24-25. Defendants assert that these awards are clearly excessive, not supported by the evidence. *Id*.

The testimony at trial revealed that Nobles' sons, K.N. and L.N. were both two years old at the time of Landon Nobles' death and at the time of trial were six years old. Tr. Vol 3, at pp. 85, 100. Kadeidra Bell, K.N.'s mother, testified that Nobles was a good father and spent time with K.N. *Id*. at pp. 100-101. She also testified that Nobles contributed by helping her with buying diapers. *Id*. at p. 104. Bell also testified that Nobles often watched K.N. for her during the week while she was at work. *Id*. According to Bell, her husband, K.N.'s stepfather, has assumed a father-figure role for K.N. and he and K.N are very close. *Id*. at p. 102. Ida Renae Nobles testified that both K.N. and L.N. know that their father loved them. *Id*. at p. 95. Plaintiff Michelle Dashaun Smith, the mother of L.N., did not testify at trial so the only testimony regarding Landon Nobles' relationship to L.N. was the testimony of Ida Renae Nobles and Kadeidra Bell. Both Ms. Nobles

and Bell indicated that K.N. and L.N. are very close as brothers and often spent time together with their father.

The court finds that the jury's awards $500,000 for past loss of companionship and society, $11.2 million for future loss of companionship and society, $250,000 for past mental anguish, and $11.2 million for future mental anguish to K.N. and L.N. are excessive. Again, comparison of other death cases involving a child's loss of parent support this finding.

For example, in *Cresthaven Nursing Residence v. Freeman*, 134 S.W. 214 (Tex. App.— Amarillo 2003), where an adult daughter brought action against a nursing home for her mother's wrongful death and was awarded $4.5 million by the jury for loss of society and companionship, the court suggested a remittitur of $3 million based on evidence that although the mother and daughter had been close when they lived together, the relationship weakened when the mother moved to the nursing home and there was "little evidence of common interests or activities." *Id.*

In *Gregory v. Chohan*, 615 S.W.3d 277 (Tex. App.—Dallas 2020), where a 45-year-old trucker was killed in a motor-vehicle accident, the court affirmed a jury's awards to the decedent's 8-year-old and 10-year-old sons of $160,000 for loss of past companionship, $160,000 for past mental anguish, $1.2 million for loss of future companionship, and its award of $1,360,000 to his infant daughter for loss of companionship and society. The *Gregory* court noted evidence of the children's significant and continuing grief, and "extensive" evidence of their decedent father's financial, educational, and emotional support to his children. *Id.*

In *Sanchez v. Mica Corp.*, 107 S.W.3d 13 (Tex. App.—San Antonio 2002), the court affirmed an award of $7 million to the two children of a woman electrocuted to death by a wire on a public sidewalk, finding that the mother was the only care-giving parent and helped one child who had a speech  impediment and learning challenges. The *Sanchez* court further noted that the

31

plaintiffs presented detailed expert testimony from a clinical psychologist who treated the children following their mother's death  who documented the mental anguish of the children. *Id*.

The limited evidence presented at trial in the instant matter does not sufficiently support the jury's awards to K.N. and L.N. totaling over $23 million each. Such a large award cannot be said in this situation to "fairly and reasonably compensate" K.N. and L.N. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Although these types of awards are necessarily imprecise, the jury "cannot simply pick a number and put it in the blank." *Id*. The $23.15 million-dollar awards look close to that. A review of the trial testimony of Ida Renae Nobles and Kadeidra Bell reveals that there was no evidence that the jury could base the extremely high awards for mental anguish and loss of companionship. On the present record, the court concludes an award greater than $2,000,000 to K.N. and L.N., each, for their past and future loss of companionship and society and $500,000 to K.N. and L.N. each for their past and future mental anguish would be excessive and remits the jury's award accordingly.

### iv.    Punitive Damages

Lastly, the court does not find the jury's awards of $187,500 in punitive damages against Defendant Egal and $150,000 against Defendant Johnson to be excessive. *See Wilen v. Falkenstein*, 191 S.W.3d 791, 802 (Tex. App.—Fort Worth 2006, pet. denied) ("We review the alleged excessiveness of an exemplary damages award under state law as a factual sufficiency challenge. . . We may only reverse if the exemplary damages award is so against the great weight and preponderance of the evidence as to be manifestly unjust."). Accordingly, the punitive damages awards will not be remitted.

## IV.    MOTION FOR ATTORNEYS' FEES

Also pending is Plaintiffs' Motion for Attorney Fees. Dkt. #77. Plaintiffs request an award of $82,400 in fees for attorney Edmund "Skip" Davis, an award of $85,200 in fees for attorney

Charles Medearis, and an award of $4,131.70 for reasonable costs. Dkt. #76; Dkt. #77. At the hearing held on March 8, 2022, Defendants indicated they do not oppose Plaintiffs' motion. *See* Dkt. #99. Accordingly, the court grants Plaintiffs' Motion for Attorney Fees (Dkt. #77) as unopposed.

V.   CONCLUSION

Based on the foregoing, **IT IS ORDERED** that Defendants' Renewed Motion for Judgment as a Matter of Law, and, in the Alternative, for New Trial or Remittitur (Dkt. #86) is **GRANTED IN PART** and **DENIED IN PART** as described in this opinion.

**IT IS FURTHER ORDERED** that the jury's award of damages is **REMITTED** as follows:

- the amount of damages awarded for Landon Nobles' past physical pain and suffering and mental anguish is remitted to $1,000,000;

- the amount of damages awarded for Ida Renae Nobles' past and future loss of companionship and society is remitted to $1,000,000;

- the amount of damages awarded for Ida Renae Nobles' past and future mental anguish is remitted to $1,000,000;

- the amount of damages awarded for K.N.'s past and future loss of companionship and society is remitted to $2,000,000;

- the amount of damages awarded for K.N.'s past and future mental anguish is remitted to $500,000;

- the amount of damages awarded for L.N.'s past and future loss of companionship and society is remitted to $2,000,000;

- the amount of damages awarded for L.N.'s past and future mental anguish is remitted to $500,000.

**IT IS FURTHER ORDERED** that, <u>**within fourteen (14) days**</u> from the entry of this order, Plaintiffs shall file a notice indicating on the record whether they elect to (a) accept the adjusted award or (b) reject the adjusted award and have a new trial on the issue of damages.[9]

Lastly, the court **ORDERS** that Plaintiffs' Motion for Attorney Fees (Dkt. #77) is **GRANTED** as unopposed.

SIGNED August 31, 2022.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE

---

[9] As noted above, remittitur may only be ordered if the party whose damages would be lowered has the option of rejecting the remitted award and opting for a new trial. *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211 (1998) (per curiam). The new trial after the rejection of a remitted award need not address liability; a new trial should be set only to determine damages. *Vogler v. Blackmore*, 352 F.3d 150, 161 (5th Cir. 2003).